1

2

3

4

5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

6

7

8

TOM MONTGOMERY as Personal Representative of the Estate of MICHAEL TRAVIS CLINARD, deceased; JENNIFER MONTGOMERY; T.C., by and through *guardian ad litem* Michael B. Smith; Z.C., by and through *guardian ad litem* Michael B. Smith; A.C. by and through *guardian ad litem* Michael B. Smith,

Plaintiffs,

v.

KING COUNTY, a political subdivision of the State of Washington, TODD CLARK, in his personal capacity; JOHN DIAZ, in his personal capacity; HIKARI (KARI) TAMURA, in her personal capacity; MYRON ALLEN, in his personal capacity; DANOTRA MCBRIDE, in her individual capacity; STEWART HANNEY, in his personal capacity; CATHERINE HOMER, in her personal capacity; BENJAMIN SANDERS, in his personal capacity; LISA PETERSON, in her personal capacity; SUEANNE BRENT, in her personal capacity; MICHAEL KILBOURNE, in his personal capacity; JOHN DOE 1 ("OCAMPO"), in his/her personal capacity; JANE DOE 2 ("REBECCA"), in her personal capacity; JOHN and JANE DOES 3-10, in their personal capacities,

Defendants.

NO. _____

COMPLAINT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPLAINT - 1

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

COMES NOW the above-named Plaintiffs, by and through attorneys Gabriel S. Galanda and Ryan D. Dreveskracht, of Galanda Broadman, PLLC, and by way of claim alleges upon personal knowledge as to themselves and their own actions, and upon information and belief upon all other matters, as follows:

## I.     INTRODUCTION

1.      Suicide has been the leading cause of death in prisons every year since 2000.[1]  This risk is disproportionately high among inmates who are mentally ill.  And mentally ill inmates are a demographic that has risen dramatically in recent years,[2] representing what many researchers have deemed "a national public health crisis."[3]  These are facts that are well known to reasonable corrections management, staff, and healthcare providers.[4]

2.      It is also well known that this crisis is not insurmountable.  Utilizing knowledge of the factors that put inmates at an increased risk of suicide, reasonable corrections administrators formulate mental health and suicide prevention policies that target these dynamics.  And if adequate supervision and training is implemented, it is more likely than not that corrections staff can prevent a majority of these suicides.

3.      Here, though, none of that happened.  Defendant King County and its administrators maintained and established inadequate practices and failed to train and supervise its employees.  As a result, numerous inmates have died.  During Michael T. Clinard's detainment at the Jail there were multiple exchanges where his serious mental illness and suicidality was known, or should have been known, and where appropriate treatment and interventions should have occurred, but did not.  Defendants' acts and omissions set into motion a particularly unfortunate series of events that

---

[1] MARGARET NOONAN, HARLEY ROHLOFF, AND SCOTT GINDER, U.S. DEP'T OF JUSTICE – BUREAU OF JUSTICE STATISTICS, MORTALITY IN LOCAL JAILS AND STATE PRISONS 1 (2015).
[2] E. FULLER TORREY, ET AL., THE TREATMENT OF PERSONS WITH MENTAL ILLNESS IN PRISONS AND JAILS 17 (2014).
[3] Jacques Baillargeon, *Psychiatric Disorders and Repeat Incarcerations*, 166 AM. J. PSYCHIATRY 103, 103 (2009).
[4] WORLD HEALTH ORGANIZATION, PREVENTING SUICIDE IN JAILS AND PRISONS (2007); Anasseril E. Daniel, *Care of the Mentally Ill in Prisons*, 35 J. AM. ACAD. PSYCHIATRY LAW 406 (2007).

COMPLAINT - 2

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

resulted in Michael's death—what might glibly be referred to as a "comedy of errors" had it not involved such a tragedy.

## II.   PARTIES

4.     TOM MONTGOMERY is the Personal Representative for the Estate of MICHAEL TRAVIS CLINARD.  This is an action arising from Michael's wrongful and unnecessary death and the Defendants' negligence, gross negligence, and deliberate indifference to Michael's serious medical condition and conditions of confinement.  The claims herein include all claims for damages available under Washington and federal law to Michael, his Estate, and all statutory and actual beneficiaries, including his spouse and minor children.

5.     JENNIFER MONTGOMERY is Michael's spouse.  She brings suit in her Personal Capacity and is entitled to damages for the loss of her husband.

6.     T.C., by and through *guardian ad litem* Michael B. Smith, is Michael's minor child. She brings suit in her Personal Capacity and is entitled to damages for the loss of her father.

7.     Z.C., by and through *guardian ad litem* Michael B. Smith, is Michael's minor child. She brings suit in her Personal Capacity and is entitled to damages for the loss of her father.

8.     A.C., by and through *guardian ad litem* Michael B. Smith, is Michael's minor child. He brings suit in her Personal Capacity and is entitled to damages for the loss of her father.

9.     Defendant KING COUNTY is a municipal corporation responsible for administering the Department of Adult and Juvenile Detention ("DAJD"), which operates two adult detention facilities: the Maleng Regional Justice Center in Kent and the King County Correctional Facility ("Jail") in downtown Seattle.  The Jail is an adult corrections facility responsible for providing proper custody, control, and supervision for county, state, and federal inmates in King County.  King County is also responsible for providing a safe and healthy environment for detainees

COMPLAINT - 3

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    and inmates within its custody at the Jail, including appropriate and necessary protection measures

2    and medical and mental health care.

3    10.    Defendant TODD CLARK is King County's DAJD Corrections Major.  He

4    supervised, administrated, and managed all King County employees and corrections facilities at the

5    time of Michael's injuries, and was responsible for ensuring the presence and implementation of

6    proper policies, procedures, and training.  Defendant Clark was also responsible for the training,

7    supervision, and discipline of King County employees and/or agents, including the below

8    individually named Defendants and Does 2 through 10.  He is sued in his personal capacity only.

9    11.    Defendant JOHN DIAZ is King County's DAJD Director.  He supervised,

10   administrated, and managed all King County employees and corrections facilities at the time of

11   Michael's injuries, and was responsible for ensuring the presence and implementation of proper

12   policies, procedures, and training.  Defendant Diaz was also responsible for the training,

13   supervision, and discipline of King County employees and/or agents, including the below

14   individually named Defendants and Does 1 through 10.  He is sued in his personal capacity only.

15   12.    Defendant HIKARI (KARI) TAMURA is King County's DAJD Deputy Director.

16   She supervised, administrated, and managed all King County employees and corrections facilities

17   at the time of Michael's injuries, and was responsible for ensuring the presence and implementation

18   of proper policies, procedures, and training.  Defendant Tamura was also responsible for the

19   training, supervision, and discipline of King County employees and/or agents, including the below

20   individually named Defendants and Does 2 through 10.  She is sued in her personal capacity only.

21   13.    Defendant DANOTRA MCBRIDE is King County's Jail Health Services Deputy

22   Division Director.  She supervised, administrated, and managed all King County Jail Health

23   Services employees at the time of Michael's injuries, and was responsible for ensuring the presence

24   and implementation of proper policies, procedures, and training.  Defendant McBride was also

25

COMPLAINT - 4

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   responsible for the training, supervision, and discipline of King County Jail Health Services

2   employees and/or agents, including the below individually named Defendants and Does 2 through

3   10.  She is sued in her personal capacity only.

4           14.     Defendants CLARK, DIAZ, TAMURA, and MCBRIDE shall hereinafter be

5   referred to collectively as "Supervisory and Policymaking Defendants."  They were at all times

6   state actors.

7           15.     Individually named Defendants MYRON ALLEN, STEWART HANNEY,

8   CATHERINE HOMER, BENJAMIN SANDERS, LISA PETERSON, MICHAEL KILBOURNE,

9   and SUEANNE BRENT are employees or subcontractors of King County.  They were at all times

10  state actors.  These Defendants knew that Michael was (1) in the need of medical care; (2) suicidal;

11  (3) in the midst of a mental health crisis; and/or (3) was housed in unconstitutional conditions of

12  confinement.  In spite of this knowledge, these Defendants took no steps to prevent serious injury

13  and/or death to Michael.  These Defendants were negligent; deliberately indifferent; and/or acted

14  in furtherance of an official and/or *de facto* policy or procedure of deliberate indifference.  These

15  Defendants are sued in their personal capacities only.

16          16.     Defendant JOHN DOE 1 ("OCAMPO") is an employee of King County with the

17  last name "Ocampo" and whose officer number is 85456.  He or she was at all times a state actor.

18  Defendant Ocampo knew that Michael was (1) in the need of medical care; (2) suicidal; and (3) in

19  the midst of a mental health crisis.  In spite of this knowledge, Defendant Ocampo took no steps to

20  prevent serious injury and/or death to Michael.  Defendant Ocampo was negligent; deliberately

21  indifferent; and acted in furtherance of an official and/or *de facto* policy or procedure of deliberate

22  indifference.  Defendant Ocampo's full name is unknown.  Defendant Ocampo is sued in his or her

23  personal capacity only.

24

25

COMPLAINT - 5

17.     SNOHOMISH COUNTY is not currently a defendant, but will be sued under *respondeat superior* for negligence only, is a municipal corporation responsible for administering the Snohomish County Jail ("SCJ"), for which Defendant JANE DOE 2 ("REBECCA") is employed and at all relevant times was acting in the scope of employment for.  Defendant Rebecca knew that Michael was (1) in the need of medical care; (2) suicidal; and (3) in the midst of a mental health crisis.  In spite of this knowledge, Defendant Rebecca took no steps to prevent serious injury and/or death to Michael.  Defendant Rebecca was negligent and deliberately indifferent.  Defendant Rebecca's full name is unknown.  Defendant Rebecca is sued in her personal capacity only.

18.     Defendants JOHN DOES 3 - 10 ("Defendants Doe") are subcontractors, employees, and/or agents of Defendants King County, City of Bothell, or Snohomish County.   These Defendants are persons who knew that Michael was (1) in the need of medical care; (2) suicidal; (3) in the midst of a mental health crisis; and/or (3) was housed in unconstitutional conditions of confinement.  In spite of this knowledge, these Defendants took no steps to prevent serious injury and death to Michael.  Each Defendant Doe was negligent; deliberately indifferent; acted in furtherance of an official and/or *de facto* policy or procedure of deliberate indifference; and/or were responsible for the promulgation of the policies and procedures and permitted the customs/practices pursuant to which the acts alleged herein were committed.  The identities of Defendants Doe unknown at this time and will be named as discovery progresses.  Defendants Doe are sued in their personal capacities only.

## III.     JURISDICTION AND VENUE

19.     This action arises under Washington State's wrongful death law and the Constitution and laws of the United States, including 42 U.S.C. § 1983.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

COMPLAINT - 6

1    20.    Venue is proper in the Western District of Washington pursuant to 28 U.S.C.§

2    1391(b)(1) and (b)(2).  King County is located in this District, and the events and omissions giving

3    rise to the claims in this action occurred in this District.

4    21.    An RCW 4.92.100 Tort Claim was properly and timely filed with the King County

5    on March 24, 2020.  Over sixty calendar days have elapsed since the claim was presented to King

6    County.

7    22.    An RCW 4.92.100 Tort Claim was filed with the City of Bothell and Snohomish

8    County on May 13, 2020. Sixty days will elapse on July 12, 2020, on which date Plaintiffs intend

9    to file a First Amended Complaint to add the City of Bothell and Snohomish County as Defendants.

10                              **IV.    FACTS**

11   **A.    BACKGROUND**

12   23.    Michael graduated with a Master of Arts degree in photography from the University

13   of Iowa in 2005.  Thereafter, he worked as a photographer's assistant, honing his photography

14   skills.

15   24.    Michael's big break came in 2010, when he landed a feature in Seattle Met, showing

16   people preforming everyday activities in yoga poses.[5]

17   25.    Over the next three years, Michael shot a number of stories for Seattle Met, and also

18   began to build a National portfolio.  He shot covers for the likes of Fortune 500, Adweek, and

19   Huffington Magazine.  By mid 2013, Michael was an eminent commodity in conceptual

20   photography.

21

22

23

24

25

---

[5] Jessica Voelker, *Yoga for Life,* SEATTLE MET, Dec. 10, 2010, https://www.seattlemet.com/health-and-wellness/2010/12/yoga-for-life-0111.

COMPLAINT - 7

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

26.     Still, though, Michael's three children were the lights of his life:



27.     As Michael told one interviewer:

I'm a photographer, but equally, if not more importantly, I'm a father and husband, so there's that conversation about how to balance a personal life with a professional life. I feel that one's personal life evolves at a pace that feels sometimes discordant or disproportionate to their professional life, and vice versa. In the end, all I can do is what I do: keep being.[6]

28.     Michael was unable to "keep being" on December 3, 2013, when he was violently attacked in Brooklyn, New York, where he was working. The beating left Michael with a broken knee cap and life-threatening traumatic brain injury ("TBI").

29.     Persons experiencing TBI are 65 percent more likely to develop schizophrenia, 59 percent more likely to develop depression, and 28 percent more likely to develop bipolar disorder.[7] And, unfortunately, that is exactly what happened to Michael.

30.     Despite coming home and receiving ongoing TBI care from UW Medical Center, Michael's mental health began to decline. He was eventually diagnosed with post-traumatic stress disorder ("PTSD"), dysthymic disorder (depression), and bipolar disorder—all of which are well-known suicide risk factors, even more so when combined.[8]

---

[6] *The Magical Mind of Michael Clinard*, THIS IS THE WHAT, Jan. 27, 2014, http://www.thisisthewhat.com/2014/01/the-magical-mind-of-michael-clinard.
[7] Sonja Orlovska, *et al.*, *Head Injury as Risk Factor for Psychiatric Disorders*, 171 AM. J. PSYCH. 463 (2014).
[8] J.M. Carter, *et al.*, *Increased Suicidal Ideation in Patients with Co-Occurring Bipolar Disorder and Post-Traumatic Stress Disorder*, 21 ARCH. SUICIDE RES. 621 (2016); Kate Robert & Suzanne Robbinss, *The Relationship Between Post- Traumatic Stress Disorder and Affective Disorder*, 23 EMERG. MED. J. 935 (2006)

COMPLAINT - 8

31.     The manifestation of Michael's mental illnesses largely took the form of self-medication and violent mood swings, which is not uncommon. The medical literature provides that bipolar and PTSD patients are prone to agitation that can result in impulsive aggression during manic and mixed episodes. Depressed states also involve intense dysphoria with agitation and irritability, which can also increase the risk of violent behavior.

32.     In February of 2017, Michael's mental illness got the best of him. In a drunken stupor he lashed out at his wife, Jennifer. She immediately sought and obtained a temporary protection order.

33.     Michael went into a tailspin. In the preceding six months Michael—who until that point had no major criminal history—was charged with a DUI, reckless driving, and violating Jennifer's protective order.

34.     Much of this erratic behavior was self-harming. On March 22, 2017, for instance, Michael drove his car into a tree. In transport to the hospital, Michael told paramedics that he intended "to 'end it all' and hopes to commit suicide in the hospital." Once at the hospital, though, Michal was given his prescribed medication (haloperidol and lorazepam), which brought him out of his mental health crisis. Michael had been on lorazepam since November of 2014.

35.     Jennifer's hope was that this involvement in the legal system would provide Michael with the mental healthcare he needed. By all accounts, including hers, Michael was a good husband and loved his children more than anything in the world. This was just a rough patch.

36.     A violation of Jennifer's protective order landed Michael before Bothell Municipal Court Judge Michelle Gehlsen on June 12, 2017.

COMPLAINT - 9

37.     The "violation" consisted of leaving a voicemail on Jennifer's phone, described a Bothell Police Officer as follows:

> I listened to the voice mail from Clinard forwarded by Montgomery. The message starts with a male stating, "Hey it's me. I'm sorry I texted you or whatever, and I'm calling you right now." The male goes on to say something about being stabbed in the heart. The male begins crying and cries for much of the remaining time in the message. At one point the male states, "Please Jenna I can't do it and I won't." The male states, "call me" before hanging up the phone. The message lasted for 1 minute and 19 seconds.

38.     Consistent with the despair expressed in the voicemail—described by Judge Gehlsen as an "ask for help"—at his pretrial detention hearing Michael, in the obvious midst of a mental health crisis, informed the Court and everyone in attendance that he intended to commit suicide in custody.  Taken into custody on a $50,000 bail, Michael yelled at Judge Gehlsen, "I won't live that long.  I don't intend to live past another two weeks!  You just signed my death certificate!"

39.     The outburst had Michael escorted out of court.  On the way out, Michael ostensibly attempted to commit suicide-by-cop by trying to head-butt the security officer ushering him out of the courtroom and grabbing at his taser.

40.     Obviously concerned for Michael's wellbeing, Judge Gehlsen took a recess and upon return, without Michael's presence:

     a.  Raised Michael's bail to $250,000, ensuring that he would remain in the care and custody of King County, unable to follow through with his plan to commit suicide; and

     b.  Recognized that there was an obviously "severe mental health component" to his behavior and ordered Michael to undergo a King County designated mental health professional ("DMHP") evaluation while in custody, finding that he met the "present[ing] an imminent likelihood of serious harm" criteria of RCW 71.05.

41.     The Judge Gehlsen's colloquy with counsel regarding Michael's "present[ing] an imminent likelihood of serious harm" to himself is haunting:

**Defense Counsel**:  Will you be requesting a mental health evaluation at this time?

COMPLAINT - 10

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Court**: I could, but I don't – Every time I have done a mental health while they're in custody they won't do anything because they're not a harm to themselves or others, because they're in custody. . . .

**Defense Counsel**: He did make that statement regarding –

**Court**: Suicide.

**Defense Counsel**: Yeah. He wasn't gonna last two weeks. That, that could qualify.

**Court**: Alright.  Then I'll have a DMHP evaluate him, um, while he's in custody. . . . What I'm trying to, counsel, is – is – have the Designated Mental Health Provider come in evaluate him now.  How do we accomplish that? Do you know Madam Prosecutor?  Or would the jail request?

**Prosecutor**: I don't know how – specifically how it works – I know that – I understand your issue with holding him and asking for it, except for his – the specificity of his statements, knowing he was going to be in custody, and I think that it would be naïve of us to not recognize that people have in fact committed suicide in jail. Um, but, if it – it does seem to be something that you should be able to request, not just prior to release but in general. . . .

**Court**:  What I'll just do is I'll have Madam Clerk contact, uh – Was he taken to Snohomish County or to King County, do you know?

**Prosecutor**: I'm guessing King County.

**Defense Counsel**:  No, he – well – they told me Snohomish.

**Court**: So then we'll contact Snohomish County Jail and see if they, um, are having a DMHP come – I, I mean I will order it – and then – based on the statements that he made.

42.     This was accomplished on the Order Setting Conditions of Release:



COMPLAINT - 11

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

43. At the time, Michael was being detained in the SCJ. Court records indicate that Judge Gehlsen's Order for a DMHP evaluation was sent to the SCJ and that Defendant Rebecca was expressly advised of Michael's suicidal outburst:

```
AMENDED ORDER SETTING BAIL/CONDITIONS OF RELEASE FAXED TO
SCJ - PHONE CALL TO REBECCA AT SNOCO JAIL TO ADVISE AMENDED
COMMITMENT AND COURTS ORDER FOR DMHP - DEF WAS MAKING
SUICIDAL STATEMENTS IN COURT
```

44. But Michael was not taken back to the SCJ. He was taken to the King County Jail. Despite having knowledge of Michael's suicidal outburst and the Judge Gehlsen's related Order for DMHP evaluation, and knowing that Michael was being transferred to the King County Jail, Defendant Rebecca failed to pass any of this information to anyone at the King County Jail.

45. *In the alternative*, Defendant Rebecca did pass this information to the King County Jail, but it was ignored.

46. Court records also indicate that Bothell Police Support Officer David Elson informed the Bothell Municipal Court that Michael was being booked into the King County Jail instead of the SCJ. Judge Gehlsen's Order Setting Conditions of Release was then faxed to the Jail:

```
PER PSO ELSON, DEF WAS BOOKED INTO KCJ DUE TO PENDING FELONY
FILINGS - ORDER SETTING BAIL AT $250,000/CONDITIONS FOR
RELEASE FAXED TO KCJ PER OFFICER REQUEST
```

47. The next day, June 13, 2017, Judge Gehlsen issued a second Order for DMHP Evaluation:

**Detain.** The Defendant is detained in custody for a sufficient time to allow the DMHP to evaluate the Defendant and consider initial detention proceedings under RCW Ch. 71.05. This court determined that "sufficient time" for purposes of this order expires at 6:00 p.m. _ a.m./p.m. on _6 16 17 @ 6 p.m._ .

The Defendant shall be released from custody in this case upon the earlier of (a) being evaluated by the DMHP, or (b) the date specified above.

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

48.     Court records indicate that the Bothell Municipal Court faxed Judge Gehlsen's Order for DMHP Evaluation and related materials to King County's Department of Community Human Services:

```
06/13/2017 AMENDED ORDER FOR DMHP EVALUATION SIGNED - FAXED TO DMHP
            WITH DISCOVERY MATERIALS
```

B.      INTAKE, SCREENING, AND HEALTHCARE

49.     Just one hour after Michael's suicidal outburst, Defendant Ocampo, who is not health trained, filled out Michael's Deferral Screening at the King County Jail, making the following notations on the Mental Health and Comments sections:



50.     In doing so, Defendant Ocampo ignored information passed to him by Bothell Officer Erik Martin, who explicitly informed Defendant Ocampo that Michael had made "suicidal statements/threats"[9] just one hour earlier:



51.     Despite explicit notice of Michael's violent outburst, Judge Gehlsen's Order, and Michael's obviously compromised mental state, Defendant Ocampo ignored this information.

52.     King County has been on notice for over a decade that its "fail[ure] to adequately train and supervise intake staff" has resulted in "serious lapses and delays in treatment during its

_____
[9] Declaration of Erik Martin (attached).

COMPLAINT - 13

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  intake process" and that these gaps "prevent inmates from receiving adequate treatment for acute

2  or chronic medical needs, placing them at risk of serious harm."[10]

3      53.    Yet that is exactly what happened here.  The information regarding Michael's

4  suicidality, suicidal outburst, and mental health crisis was entirely ignored throughout the intake

5  process and, in turn, the remainder of his stay at the Jail.

6      54.    After the Deferral Screening was completed, an examination was completed by

7  Defendants Stewart Hanney, RN; Catherine Homer, LPN; and Benjamin Sanders, MD—none of

8  whom are mental health providers, and none of whom took any interest in the documentation of

9  Michael's suicidality earlier that day.  It was in Michael's medical chart, and in at least two court

10  orders finding that Michael met the "harm to self or others" requirement of RCW 71.05, but it was

11  ignored.

12      55.    The next day, June 13, 2017, Defendant Homer discovered that Michael's treating

13  psychiatrist, Dr. Sang Suh, had prescribed him a number of medications for his serious mental

14  illnesses, including lithium, Zoloft, Adderall, and lorazepam.

15      56.    From these prescriptions alone, any medical professional exercising his or her

16  professional judgment would have inferred that Michael was seriously mentally ill.  *See Mraz v.*

17  *Astrue*, No. 07-2672, 2008 WL 2561878, at *2 (N.D. Cal. June 26, 2008) ("Lithium is a well-

18  established treatment for mania in bipolar disorder."); *Hamlin v. Colvin*, No. 12-6369, 2013 WL

19  3708381, at *4 (C.D. Cal. July 12, 2013) ("Zoloft is a selective serotonin reuptake inhibitor used to

20  treat depression, obsessive-compulsive disorder, panic attacks, and social anxiety disorder.*"); Hill*

21  *v. Ehrlich*, No. 04-2562, 2005 WL 1220885, at *1 n.2 (D. Md. May 23, 2005) ("Adderall is a daily

22  extended-release, single-entity amphetamine indicated for the treatment of ADHD."); *Niewierski v.*

23

24

25

---

[10] U.S. Dep't of Justice, Civil Rights Division, Findings of the Civil Rights Division's Investigation of Conditions at the King County Correctional Facility 23 (2007).

COMPLAINT - 14

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

*Astrue*, 737 F. Supp. 2d 459, 465 n.8 (W.D. Pa. 2010) ("Lorazepam is used to treat anxiety or anxiety associated with symptoms of depression.").

57.    Defendant Lisa Peterson, ARNP, conferred with Dr. Suh, who confirmed that Michael had been prescribed these medications.  Peterson ordered the Lithium and Zoloft, but not the Adderall or lorazepam "per [Jail Health Services] policies."  Defendant Peterson also took no interest in the documentation of Michael's suicidality earlier that day, instead recommending as follows:

> Based on review of the chart, the following action is taken regarding the patient's psychiatric follow-up: Psych P2 in 30 days.

Michael's "follow-up" was scheduled for July 12, 2017—a week after his death.  Defendant Peterson did not evaluate or assess Michael.

58.    On June 14, 2017, Defendant Kilbourne spoke with the DMHP mental health provider who relayed to him information about Michael's violent outburst just two days earlier, Judge Gehlsen's Order for DMHP evaluation, and Michael's obviously compromised mental state.  This was news to Defendant Kilbourne—he was not aware of any DMHP referral.  He looked for one in Michael's medical chart, and when he found no DMHP referral there he took no further action to either ensure that Michal was evaluated by a DMHP or to ensure Michael's safety given the disturbing information relayed to him by the DMHP.  This response by Defendant Kilbourne— or, more accurately, a lack of any response at all—fell far below the applicable standard of care and exhibits a failure to exercise any professional judgement at all.

59.    On June 21, 2017, Michael requested treatment for his serious mental illness that the Lithium and Zoloft were not addressing.  The next day, Michael met with Defendant Sanders and also disclosed his recent TBI, and requested to be evaluated by a mental health provider.  Defendant Sanders reviewed Michael's chart, assed him as having a "Hx of mental illness," and made "[n]o additional treatment plan changes."

COMPLAINT - 15

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    60.    Like the other medical and mental health providers before him, Defendant Sanders

2 took no interest in the documentation of Michael's TBI, serious mental illness, need for prescribed

3 medication (Adderall and lorazepam) or earlier vow to commit suicide in the Jail.

4    61.    On June 24, 2017, at approximately 12:08 p.m., Michael reported to Defendant

5 Sueanne Brent, RN, that, again, Lithium and Zoloft were not addressing his serious mental illnesses.

6 Michael "request[ed] to have [a] psych appt," pleaded for some changes to his medication or some

7 semblance of a "plan of care," and informed Defendant Brent that he was going through a divorce.

8    62.    Defendant Brent discussed "3 levels of psych housing" with Michael and told him

9 to kite "if s/sx get worse" and that he needed to wait for his "follow-up" appointment scheduled for

10 July 12, 2017, before he could receive any psychiatric care.[11]

11    63.    Like the other medical and mental health providers before her, Defendant Brent took

12 no interest in the lack of prescribed medication (Adderall, and lorazepam), Michael's TBI, or the

13 documentation of Michael's earlier vow to commit suicide in the Jail.

14    64.    Benzodiazepine withdrawal (including lorazepam) can be lethal.  When a lorazepam

15 user stops using the drug "cold-turkey," significant changes in brain chemistry rapidly occur.  One

16 common effect of withdrawal from lorazepam is a significantly increased suicide risk.[12]  This is

17 well-known by corrections and medical professionals exercising their professional judgment.

18    65.    The next note in Michael's medical chart is on July 3, 2017, at 8:02 p.m.:

19

20

21

22

23    [11] "A 'kite' is a means of internal communication often used by prisons and state hospitals.  Kites are essentially notes that patients and prisoners write to prison officials."  *Bennett v. Turner*, No. 15-4197, 2015 WL 9165926, at *7 n.3 (N.D. Iowa Dec. 16, 2015).

24    [12] Tyler J. Dodds, *Prescribed Benzodiazepines and Suicide Risk: A Review of the Literature*, 19 PRIM. CARE COMPANION CNS DISORD. e1 (2017); Douglas Turkington & Paul Gill, *Mania Induced by Lorazepam Withdrawal*, 17 J. AFFECTIVE DISORDER. 93 (1989).

25 COMPLAINT - 16

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

**Jenise Temko, RN at 7/3/2017  8:02 PM**
Status:  Signed

2

3

Medical status 3 called at 1840 after pt found with ligature tied around his neck
Pt unresponsive, no pulse. Medics notified
1845 - CPR  Begun, airway suctioned, pt bagged - pt skin dusky colored , unresponsive , blood to face ?
From nose
1844 - AED applied, no shock advised
        CPR resumed,
        AED no shock advised
1850- medics arrive, They assume care

4

5

6

  66. Throughout the intake and screening process, there were multiple opportunities to

7

get Michael the psychiatric care that he needed, but each provider down the chain completely

8

dropped the ball.  Any jailer or medical provider exercising his or her professional judgment would

9

view any indication of suicidal intent—especially a violent outburst, by a detainee with known

10

serious mental illness, making very specific suicidal expressions—as more than enough to

11

immediately make a referral to psychiatric housing to receive close monitoring, evaluation, and

12

treatment.  Yet, despite his known serious mental illnesses, Michael did not even receive a

13

psychiatric evaluation.

14

  67. An adequate psychiatric assessment—which was apparently scheduled for July 12,

15

2017; nearly a month after intake and screening; nearly a month after Michael vowed in an open

16

King County court to commit suicide in the Jail—would not simply ask the detainee if he or she is

17

suicidal and take them at their word, as Defendants here did.

18

  68. Rather, an adequate assessment would take into account both acute and chronic

19

suicide risk factors and arrive at a standardized suicide risk score.  This would be based upon not

20

only self-report, but any available collateral sources as well (medical and mental health records).

21

Known collateral sources would be obtained and the inmate's assessment would be updated, as

22

appropriate, as soon collateral sources can be reviewed.

23

**C.** **EVENTS OF JULY 3, 2017**

24

  69. From the day that Michael arrived at the Jail, it was obvious that he was depressed

25

and in the throes of a perilous mental state.

COMPLAINT - 17

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

70.     Fellow inmates interviewed after Michael's death testified that "something wrong with him"; he was "not well"; he was "very depressed," "stressed out," "constantly pacing," and "always bummed out."  Every inmate that genuinely interacted with Michael noticed it.  Every jailer exercising his or her professional judgment would have noticed it.  Because, again, it was obvious.

71.     At roughly 4:40 p.m. on July 3, 2017, the inmates in Michael's cell were "racked in" and a cell check was conducted.  This is the last time that any type of wellness or safety check was accomplished.

72.     Michael was allowed out of his cell for the evening because he was on cleaning duty and, as a reward for fulfilling this duty inmates are allowed an hour or so out with free reign of the television.  Aside from making a phone call, though, Michael did not come out of his cell.

73.     At approximately 5:43 p.m., Michael spoke on the phone with his mother, Maria, for just over four minutes.  While on the phone Michael expressed that he was going to commit suicide: "I'm done, I'm just done, . . . talk to you on the other side, love you."  Michael's final words to his mother were, "I'm doing what I need to do."

74.     This conversation was being recorded and was heard by jailers and inmates who reported it to jailers, but no steps to intervene in Michael's suicide were taken.

75.     Michel then went and locked himself in his cell, where he was housed alone.

76.     At 6:40 p.m., inmates discovered Michael hanging in his room from a ligature.  His face was purple, but he was still breathing.

77.     The inmates immediately notified Defendant Allen, who allegedly thought the inmates were "joking" and, according to one inmate's account, "just walked away."

78.     It was not until a second and third time that Defendant Allen was informed of Michael's suicide attempt that he took it seriously.

COMPLAINT - 18

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

79.     According to one inmate:

[Defendant Allen] wasn't even upstairs yet and I ran back and I was like, "Hey, bro. Hurry up. He's purple. Like, what are you doing?" And then he, like, he, like, looked at us and then, like, there were still about, like, 30 seconds, and then, like, I ran and I was looking at 4 House and 5 House and they racked back, so people racked back. . . . So the guard took his sweet time. H-he took like two minutes to get there.

80.     In fact, much more time passed.  Defendant Allen admitted in a subsequent interview that *six crucial minutes had passed* from the time he was first notified that Michael was hanging and when he finally entered the day room area.

81.     According to Seattle Police Department's Case Investigation Report:

At approximately 1840 hours CO Allen said the inmate in 2 house notified him that Clinard was not moving. CO Allen said that he initially thought the inmates in Upper A were joking with him. At approximately 1846 hours CO Allen went up to the Upper A, day room area and subsequently to 3 house (Clinard's cell) and saw that he was indeed not moving and there was blood on the floor.

82.     Once he finally arrived at Upper A, instead of immediately attending to Michael, Defendant Allen made sure that all of the other inmates got in their rooms and that he had all of the doors closed.

83.     According to Defendant Allen himself, this "took 'em a minute to do that because they were all middling around because they were all curious what's going on."  More crucial minutes passed.

84.     Defendant Allen then "walked in" Michael's cell and asked his supine body, purple face and head, "What's up, man? What's goin' on?"  When Michael didn't answer, Defendant Allen yelled "Hey!" to get Michael's attention.  When that didn't work, Defendant Allen "called a Code 3 over the radio"—which, according to Defendant Allen himself, "means somebody is either dying, died, or is in the process of killing himself."

85.     Instead of attempting to remove the ligature or provide lifesaving aid, though, Defendant Allen just stood there waiting for a response to his Code 3 call.  In Defendant Allen's

COMPLAINT - 19

own words: "I thought he was either dead or unconscious. . . . I didn't touch him."  More crucial minutes passed.

86.     Officers Currier and Spicer were the first to respond to Defendant Allen's call.  Both Officers Currier and Spicer fumbled with the cloth around Michael's neck, without success.  More crucial minutes passed.

87.     Officer Currier yelled out for a "rescue knife," which another Officer, Officer Awasthi, retrieved from a secured location on the other end of the facility.  More crucial minutes passed.  The knife was then handed off to Officer Julius, who ran it to Officer Currier, who was finally able to cut it off.

88.     Michael was then removed from his cell to the "day room," where CPR was administered by King County officers.

89.     Michael was pronounced dead by medical providers at 7:10 p.m.

90.     On July 26, 2017, the King County Medical Examiner concluded as follows:

PATHOLOGICAL DIAGNOSES:

1.  Ligature strangulation.
    a.  Ligature furrow encircling neck.
    b.  Facial skin and conjunctival petechiae.

2.  Attempted resuscitation with endotracheal intubation.

OPINION:

The cause of death of this 38-year-old man found in his jail cell with a ligature made from a torn bed sheet wrapped tightly about his neck is asphyxia due to ligature compression of neck. The manner of death is suicide.

**D.     KING COUNTY POLICY AND ESTABLISHED PRACTICE – *MONELL*, SUPERVISORY, AND POLICYMAKING LIABILITY**

91.     The death by suicide of Michael was tragic and could have been prevented by standard approaches to medical and mental health care management.

COMPLAINT - 20

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

92.     The policies, established procedures, and protocols in place at the Jail—maintained *vis-à-vis* its Supervisory and Policymaking Defendants—put Michael and all other similarly situated patients at an increased risk of serious harm and death.

93.     That these policies, established procedures, and protocols would put similarly situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment.

94.     King County—*vis-à-vis* its Supervisory and Policymaking Defendants—also failed to adequately train its employees, resulting in a condition that put Michael and all other similarly situated patients at an increased risk of serious harm and death.

95.     That this failure to train would put similarly-situated patients at an increased risk of serious harm and death would be obvious to any medical or mental health professional exercising his or her professional judgment.

96.     The scope of a medical or mental health provider's duty to a patient is determined by the standard of care.  Here, the jailers and medical and mental health staff were indifferent to the medical needs of Michael, and that indifference was indicative of a pattern of following below the standard of care in dealing with the needs of patients.

97.     Michael would have not died at the time and in the manner that he did, had jailers and medical and mental health staff not been indifferent to his needs.

98.     Jailers and medical and mental health staff's indifference to Michael's serious medical and mental health needs was ratified by Supervisory and Policymaking Defendants.

99.     Despite knowledge of Michael's serious medical needs, jailers and medical and mental health staff failed to administer and attend to Michael in the evening of July 3, 2017.  As a result, Michael was allowed to successfully take his own life.

COMPLAINT - 21

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

100.    Defendant Allen did not have a rescue tool on his person when he found Michael with cloth around his neck not breathing.  Officers Currier and Spicer did not have a rescue tool either.

101.    Hanging is the most common form of successful suicide in jails.  This is well-known and was in fact known by King County and its Policymaking and Supervising Defendants.

102.    Reasonable and prudent jailers and jail administrators possess or make immediately available for their subordinates relatively inexpensive rescue tools:



103.    Defendant Allen and Officers Currier and Spicer's failure to possess this type of tool and King County's failure to make this type pf tool available to them, constitutes negligence and deliberate indifference.

104.    Defendant Allen or Officers Currier and Spicer's possession of this tool would have prevented Michael's extended period of suffocation and saved his life.

105.    All of the acts and omissions taken in regard to the care and custody of Michael were in accordance with King County's established practices and/or were ratified by the Policymaking and Supervisory Defendants.

106.    It is a common and widespread practice at the Jail to ignore information related to suicidality and healthcare in a measured attempt to avoid liability in a deliberate indifference action, by claiming a lack of knowledge.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

107.   King County has a policy of placing inmates' cells without a cellmate ("solitary confinement"), without a mental health assessment, regardless of whether the inmate's healthcare or mental healthcare needs contraindicated such confinement.

108.   Reasonable and prudent jailers and jail administrators also do not utilize cloth-type sheets, which inmates can easily hang themselves with.  King County and its Policymaking and Supervisory Defendants usage of cloth-type sheets, in the face of other suicides wherein cloth-type sheets were utilized, constitutes negligence and deliberate indifference.

109.   Solitary confinement and similar types of confinement are well known by prudent jail administrators to have exceedingly injurious effects on an inmate's mental health-which is why a policy of housing mentally ill inmates in segregation without first adequately assessing risks to an inmate's mental health is never allowed; it poses an unnecessary risk of harm to inmates.

110.   King County and its Policymaking and Supervisory Defendants were also negligent and deliberately indifferent when they failed to adequately train individual Defendants.  These individual Defendants failed to perform their duties as described in this Complaint due to inadequate training.  King County and its Policymaking and Supervisory Defendants knew that King County's training inadequately instructed its employees, but did nothing to change this policy.

111.   King County and its Policymaking and Supervisory Defendants failed to adequately train officers and employees in suicide prevention.

112.   King County and its Policymaking and Supervisory Defendants failed to train officers and employees in suicide prevention policies and procedures.

113.   King County and its Policymaking and Supervisory Defendants failed to train officers and employees to properly monitor and to protect inmates.

114.   King County and its Policymaking and Supervisory Defendants failed to train officers and employees to properly identify and monitor at-risk inmates.

COMPLAINT - 23

115. King County and its Policymaking and Supervisory Defendants failed to train officers and employees in in-take procedure.

116. King County and its Policymaking and Supervisory Defendants failed to enforce policies and procedures for suicide prevention, including, but not limited to, policies and procedures for prisoner in-take and monitoring of prisoners.

117. King County and its Policymaking and Supervisory Defendants failed to enforce the aforesaid policies and procedures by disciplining officers and employees or by other means.

118. King County and its Policymaking and Supervisory Defendants caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures.

119. King County and its Policymaking and Supervisory Defendants maintained inadequate suicide prevention policies and procedures which, failed to identify and/or monitor at-risk detainees.

120. King County and its Policymaking and Supervisory Defendants maintained inadequate in-take policies and procedures, which failed to identify at-risk detainees and failed to identify and monitor prescription medication and treatment.

121. King County and its Policymaking and Supervisory Defendants maintained inadequate monitoring and safety check systems.

122. King County and its Policymaking and Supervisory Defendants maintained a policy of placing inmates into solitary confinement with ready means to commit acts of self-harm, without adequate review by a mental health provider prior to such a placement.

123. King County and its Policymaking and Supervisory Defendants failed to create systems of information sharing, communication, and clearly delineated roles and lines of authority

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

for King County Jail staff, officers bringing in detainees from the street or other facilities, and/or courts.

124.    King County and its Policymaking and Supervisory Defendants failed to provide sufficient resources to provide for the necessary medical care for mentally ill inmates.

125.    King County and its Policymaking and Supervisory Defendants maintained a policy of using cursory mental health and suicide screening that essentially amounted to no screening at all for incoming inmates.

126.    King County and its Policymaking and Supervisory Defendants maintained a policy of not regularly monitoring inmates.

127.    King County and its Policymaking and Supervisory Defendants maintained a policy of ignoring and refusing to implement relatively inexpensive suicide prevention measures.

128.    King County and its Policymaking and Supervisory Defendants maintained a policy of refusing to allow inmates to obtain medically necessary prescribed medication (here, Adderall and lorazepam).

129.    King County and its Policymaking and Supervisory Defendants maintained no established protocol—written or unwritten—regarding the monitoring or medical treatment of benzodiazepine (lorazepam) withdrawal syndrome, and otherwise refuses to acknowledge the well-known dangers attendant to benzodiazepine (lorazepam) withdrawal syndrome, including increased suicide risk. *Cf. Aus v. Salt Lake Cty.*, No. 16-0266, 2019 WL 3021217, at *8 (D. Utah Jul. 10, 2019).

130.    King County and its Policymaking and Supervisory Defendants maintained a policy of permitting employees to provide clearly inadequate suicide prevention care.

131.    King County and its Policymaking and Supervisory Defendants have implemented a custom of improperly indemnifying, and of conspiring to indemnify jailers, for punitive damages

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  assessed against those jailers by juries in civil rights cases, and this practice was a moving force

2  that caused the violations of Michael's rights, as alleged herein.

3       132.   King County's official policies remained static from 2015 to 2017.   This, in and of

4  itself created a significant risk of serious harm.   The danger in lack of a more frequent review of

5  policies is that they are not kept current with the emerging body of knowledge that guide most

6  competent corrections officials.   Whether standards have changed as a result of litigation or due to

7  advancements in correctional knowledge, policies without frequent review are behind the times and

8  inadequate to provide sufficient guidance to facility staff, as is the case with the policies of the Jail.

9       133.   A death in a correctional facility is a very serious incident.   A death by suicide or

10 diabetes complications typically causes an incident review to occur which includes a complete

11 accounting of what happened, what lessons can be learned from the event and what changes need

12 to be made in order decrease the likelihood that it occurs again. Had King County officials had an

13 adequate policy in place to review previous incidents of deaths by suicide, accommodations could

14 have been made that would have kept Michael safe and alive.

15      134.   Nothing is more fundamental in corrections work than regular safety checks to make

16 sure the inmates are safe.   King County and its Policymaking and Supervisory Defendants failed to

17 have the appropriate policy in place in this regard.   Had King County and its Policymaking and

18 Supervisory Defendants kept their policies updated to reflect common correctional practices and

19 standards, Michael's death would have been prevented.

20      135.   Each of the above policies and established practices amounts to negligence and

21 deliberate indifference to the known and/or obvious risk of suicide and serious medical and safety

22 needs of at-risk detainees, including Michael.

23      136.   King County employees and subcontractors deliberately did not comply with formal

24 policies and national standards, which evidences their deliberate indifference and negligence.  *See*

25

COMPLAINT - 26

*Salter v. Booker*, No. 12-0174, 2016 WL 3645196, at *12 (S.D. Ala. June 29, 2016) ("Defendants acted with deliberate indifference when they failed to enforce or follow the written jail policies and procedures put in place to protect suicidal prisoners.").

137.    Defendants are not even trying; they have been negligent, grossly negligent, and have showed deliberate indifference to the medical and safety needs of the inmates at the Jail.  This includes, again, failing to have and follow proper training, policies, and procedures for the care and treatment of people in the Jail.  It also includes a cold-hearted attitude on the part of staff and subcontractors, who ignore medical and safety harms as they present and who turn a blind eye and a deaf ear to people who have serious medical and safety needs.

138.    Each and every individually named Defendant had knowledge that a substantial risk of serious harm existed as to Michael's health and safety.  King County and its Policymaking and Supervisory Defendants had knowledge that their policies, customs, and/or protocols created a substantial risk of serious harm as to Michael's health and safety.  But even if Defendants did not have knowledge of the risk of harm, the risk created by their policies, customs, and/or protocols- and lack thereof/lack of training thereon/lack of funding to implement-was obvious in light of reason and the basic general knowledge that Defendants are presumed to have obtained regarding the type of deprivation.

139.    The acts and omissions caused by Defendants through their policies, practices, customs-including inadequate staffing, training, preparation, procedures, supervision, and discipline-were a proximate cause of Michael's pain, suffering, death, and Plaintiffs' damages.

**F.    DAMAGES**

140.    Michael was 38 years old at the time of his death.  He left behind a loving wife and three lovely children.

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

141.     The aforesaid acts and omissions of Defendants deprived Michael of his right to be free from cruel and punishment and to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution; directly caused and/or directly contributed to his pain, suffering, and a general decline of his quality of life; directly caused and/or directly contributed to cause his death; directly caused and/or directly contributed to cause his family to suffer loss of services, companionship, comfort, instruction, guidance, counsel, training, and support; and directly caused and/or directly contributed to cause his family to suffer pecuniary losses, including but not limited to medical and funeral expenses.

142.     Prior to death, Michael suffered extreme physical and mental pain, terror, humiliation, anxiety, suffering, and emotional distress.

143.     Michael's death was completely unnecessary and could have been easily prevented via provision of even the most basic medical care and treatment.

## V. CLAIMS

### A.     FIRST CAUSE OF ACTION – NEGLIGENCE—ALL DEFENDANTS

144.     Defendants had a duty to care for inmates and provide reasonable safety and medical and psychiatric care.

145.     This duty extends to foreseeable self-inflicted harms and includes protecting inmates against suicide and identifying at-risk inmates.

146.     This duty is an affirmative one under both Washington State and federal law because prisoners, by virtue of incarceration, are unable to obtain medical and psychiatric care for themselves.

147.     Defendants breached this duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the assessment of persons with apparent medical and psychiatric needs.

COMPLAINT - 28

148.    Defendants breached this duty, and were negligent, when they failed pass on vital lifesaving information from one institution or person to another.

149.    Defendants breached that duty, and were negligent, when they failed to adequately treat Michael's medical and psychiatric needs.  Indeed, because Michael's medical and psychiatric needs were entirely ignored, Defendants were grossly negligent.

150.    Defendants breached that duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the provision of reasonable and necessary medical and psychiatric care, treatment of inmates, and the passing on of information.

151.    Defendants breached that duty, and were negligent, when they failed to ensure adequate and proper staffing at the Jail.

152.    Defendants breached that duty, and were negligent, when they failed to ensure that Michael was properly supervised and/or that cell checks were conducted in a safe, timely, and consistent manner.

153.    Defendants breached that duty, and were negligent, when they failed to ensure that Michael received prescribed medication.

154.    Defendants breached that duty, and were negligent, when they ignored notification of Michael's serious mental health condition and suicidality.

155.    Defendants breached that duty, and were negligent, when they failed to properly assess and treat Michael prior to his death.

156.    As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, Michael was allowed to successfully take his own life.

157.    Michael suffered unimaginable pre-death pain, suffering, embarrassment, and terror.

COMPLAINT - 29

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

158.    As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, Plaintiffs have incurred and will continue to incur economic and noneconomic damages in an amount to be determined at trial.

159.    As a direct and proximate result of the negligence of Defendants, Michael's wife and three children have suffered the loss of familial association with Michael.  Plaintiffs have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Michael's wrongful death.

**B.    SECOND CAUSE OF ACTION – 42 U.S.C. § 1983—KING COUNTY AND ALL INDIVIDUALLY NAMED DEFENDANTS**

160.    The acts and failure to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

161.    At the time Michael was detained by King County, it was clearly established in the law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates, including from self-harm.

162.    Being subjected to unnecessary physical and mental pain and suffering is simply not part of the penalty that criminal offenders pay for their offenses against society.  As a result, municipalities and Jail officials are liable if they know that an inmate or inmates face a substantial risk of serious harm and callously disregards that risk by failing to take reasonable measures to abate it.

163.    Here, Defendants knew that Michael faced a substantial risk of suicide, yet callously disregarded that risk by failing to take reasonable measures to abate it.

164.    Here, Defendants knew that Michael faced a substantial risk of harm or death due to his serious mental health condition, yet callously disregarded that risk by failing to take reasonable measures to abate it.

COMPLAINT - 30

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

165.    Having an inmate in custody creates a duty of care that must include enough attention to mental health concerns that inmates with obvious symptoms receive medical attention. Defendants had numerous opportunities to meet their responsibilities to help Michael, but no one did.  One cannot avoid responsibility by putting one's head in the sand.

166.    Here, King County and its Policymaking and Supervising Defendants knew of and callously disregarded the excessive risk to inmate health and safety caused by King County's inadequate formal and informal policies, including a lack of training, funding, and supervision.

167.    King County and its Policymaking and Supervising Defendants knew of this excessive risk to inmate health and safety because it was obvious and because numerous other inmates had been injured and/or killed as a result of these inadequacies in the past.

168.    King County and its Policymaking and Supervising Defendants were responsible for a policy, practice, or custom of maintaining a longstanding constitutionally deficient safety and medical and mental health care, and training thereon, which placed inmates like Michael at substantial risk.

169.    King County—at a bare minimum *vis-à-vis* its Department of Community Human Services—knew of Judge Gehlsen's Order for DMHP evaluation and Michael's suicidal outburst, yet ignored this information and the risk to Michael's life that it represented.  This was, again, due to King County's policy of failing to pass on vital, lifesaving inmate information to those persons on the ground who are able to provide necessary healthcare care.

170.    There was little to no supervision of Michael and inmates like him because King County and its Policymaking and Supervising Defendants maintained a known policy and custom of understaffing—leaving one jailer responsible for the care and wellbeing of over ninety inmates at a time.  That this ratio would result in serious injury or death would have been obvious to any corrections management official exercising his or her professional judgment.  According to the U.S.

COMPLAINT - 31

Department of Justice's Bureau of Justice Statistics, for example, the average jailer-inmate ratio in the United States around the time of Michael's death was one to four.[13]

171.    While it appears that King County did have a suicide prevention policy, King County's actual policy was to ignore the written policy—written policy intended to protect inmates from the foreseeable consequences of not following the written policy, including death by suicide.

172.    King County also has an impermissible policy of using cursory mental health screenings and "check-box determinations" to determine that mentally ill inmates are not a danger to themselves.

173.    King County had an unwritten policy of understaffing and indifference to inmate supervision that was maintained with deliberate indifference.  King County and its Policymaking and Supervising Defendants know that the Jail is understaffed and that their employees often have trouble completing all of their duties as a result of this understaffing.  Yet these Defendants failed to take any steps to correct these inadequacies.

174.    The Defendants' lack of clear delineation of authority and inadequate means of communication with respect to assessing risks of suicide was an additional policy that caused jailers' failure to prevent Michael's pain, suffering, and death.  In essence, there is a "who's on first" problem at the Jail where an established practice of non-communication to one another or amongst themselves in regard to inmate suicidality and safety has been implemented.  Exhibit A: The court order under which Michael was being detained included a mandatory evaluation for suicidality, due to his express statements in open court that he would kill himself in jail, yet nobody responsible for Michael's care seemed to be aware of this vital information—or if they were, they chose not to acknowledge it.  Michael was never evaluated by a DMHP, as Judge Gehlsen had ordered.

---

[13] ZHEN ZENG, JAIL INMATES IN 2016 (2018), *available at* https://www.bjs.gov/content/pub/pdf/ji16.pdf.

COMPLAINT - 32

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

175.    Defendants were subjectively aware that Michael was suicidal, or at a minimum in the midst of a mental health crisis.  From this evidence, a reasonable jailer and/or healthcare provider would have been compelled to infer that a substantial risk of serious harm existed.  Indeed, Defendants did infer that a substantial risk of serious harm existed, but failed to take any steps to alleviate this risk.  And Michael died as a result.

176.    Defendants had a policy, custom, and practice of denying treatment, such as prescribed medication; these policies, customs, and practices posed a substantial risk of serious harm to the inmates in the jail, including Michael, and Defendants knew that its policies, customs, and practices posed this risk.

177.    Defendants knew of a number of previous suicides and incidences of self-harm, yet deliberately did nothing to provide its personnel with adequate training to prevent future suicides and incidences of self-harm.  Instead, Defendants acquiesced in a long-standing policy and custom of inaction.

178.    Indeed, even without the previous in-custody deaths, it was obvious that a total lack of training to appropriately address mentally ill inmates would result in the harm caused here. King County and its Policymaking and Supervising Defendants were expressly informed that its official policies were being ignored and that its unofficial or *de facto* policies would result in inmate deaths, yet deliberately did nothing to address these unofficial or *de facto* policies.

179.    King County had numerous opportunities to obtain training to appropriately address physically and mentally ill inmates, but knowingly and deliberately declined to obtain it.

180.    King County has consistently failed to attend to the serious medical needs of inmates.  King County and its Policymaking and Supervising Defendants knew that there were successful suicides in recent years, and that there were relatively inexpensive prevention measures available.  Yet King County and its Policymaking and Supervising Defendants did not employ any

COMPLAINT - 33

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  of these measures.  In addition, these Defendants knew that its employees were not providing

2  adequate suicide prevention care, but continued to employ them nonetheless.

3      181.    As a direct and proximate result of the deliberate indifference of Defendants, as

4  described above and in other respects as well, Michael died a terrible and easily preventable death.

5  He suffered pre-death pain, anxiety, and terror, before becoming asphyxiated, and leaving behind

6  a loving wife and three children.

7      182.    As a direct and proximate result of the deliberate indifference of Defendants,

8  Plaintiffs—Michael's wife, two daughters, and one son—have each suffered the loss of familial

9  association with Michael, in violation of their Fourteenth Amendment rights.  Plaintiffs, each of

10  them, have suffered and continue to suffer extreme grief and harm due to mental and emotional

11  distress as a result of Michael's death.

12      183.    Defendants have shown reckless and callous disregard and indifference to inmates'

13  rights and safety, and are therefore subject to an award of punitive damages to deter such conduct

14  in the future.

15                          **VI.      JURY DEMAND**

16      185.    Plaintiffs hereby demand a trial by jury.

17                          **VII.     AMENDMENTS**

18      186.    Plaintiffs hereby reserves the right to amend this Compliant.

19                          **VIII.   RELIEF REQUESTED**

20      187.    Damages have been suffered by all Plaintiffs and to the extent any state law

21  limitations on such damages are purposed to exist, they are inconsistent with the compensatory,

22  remedial and/or punitive purposes of 42 U.S.C. § 1983, and therefore any such alleged state law

23  limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

24      188.    WHEREFORE, Plaintiff requests a judgment against all Defendants:

25

COMPLAINT - 34

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    (a)    Fashioning an appropriate remedy and awarding economic and noneconomic

2           damages, including damages for pain, suffering, terror, loss of consortium,

3           and loss of familial relations, and loss of society and companionship pursuant

4           to 42 U.S.C. §§ 1983 and 1988, in an amount to be determined at trial;

5    (b)    Punitive damages;

6    (c)    Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988,

7           or as otherwise available under the law;

8    (d)    Declaring the defendants jointly and severally liable;

9    (e)    Awarding any and all applicable interest on the judgment; and

10   (f)    Awarding such other and further relief as the Court deems just and proper.

11   Respectfully submitted this 4th day of June, 2020.

12                                           GALANDA BROADMAN, PLLC

13                                            s/Ryan D. Dreveskracht

14   Ryan D. Dreveskracht, WSBA #42593
      s/Gabriel S. Galanda

15   Gabriel S. Galanda, WSBA #30331
     Attorneys for Plaintiffs

16   P.O. Box 15146 Seattle, WA 98115
     (206) 557-7509 Fax: (206) 299-7690

17   Email: ryan@galandabroadman.com
     Email: gabe@galandabroadman.com

18

19

20

21

22

23

24

25

COMPLAINT - 35