*TOM MONTGOMERY, et al.,*
*Plaintiffs,*
*v.*
*KING COUNTY, et al.,*
*Defendants.*
*in the UNITED STATES DISTRICT COURT for the WESTERN DISTRICT of WASHINGTON at SEATTLE*
*Case Number: 20-cv-00855-RAJ*

# EXPERT REPORT

## I. INTRODUCTION

This is an expert report addressing the issues related to the care and custody of Mr. Michael Travis Clinard between June 12, 2017, and July 3, 2017, while in the custody of the King County Department of Adult and Juvenile Detention (DAJD) King County Correctional Facility (KCCF). This report is predicated upon the information outlined in the section "Materials Reviewed." Should additional information be disclosed that affects my opinions and conclusions, I reserve the right to alter my opinions and conclusions as necessary.

## II. QUALIFICATIONS

I have been employed in the criminal justice system since 1984, when I began work with the Fayette County Detention Center in Lexington, Kentucky, as a Deputy Jailer. In 1985 I was assigned as Training Coordinator for the Fayette County Detention Center and began developing a formal Pre-service and In-service Deputy Jailer training program for the jail. An area of additional assignment was the development, revision, and maintenance of the Detention Center's policies and procedures. I remained in this position until 1992. I assumed the position of Planning and Research Analyst at the Detention Center to develop and implement an objective jail classification system. This implementation included developing a management information system infrastructure and programming to accomplish the goals of the jail classification system. I attained the position of Administrative Deputy, Senior (Deputy Director) for the Division of Detention in 1996. I assumed an increased level of administrative responsibility that included a primary role in the planning, designing, and construction of a 1000+ Direct Supervision detention facility, combining the principles of Objective Jail Classification with Direct Supervision. Throughout my tenure, I continued to perform the functions of a Deputy Jailer, often wearing two or more hats. Performing those essential job functions varied and diminished in frequency as the supervisory responsibilities within the agency increased.

In 2001, I took on the additional responsibility for contract development and management for privatized services (food, medical, mental health, commissary, inmate telephones), and various other projects. In 2004, I developed and supervised the Division of Community Corrections Bureau of Professional Standards, which included Internal Affairs; Safety, Sanitation and Standards; Contract Monitoring and Administrative and Disciplinary Hearings. I retired from my last position in August 2008.

My consulting activities began in the early 1990s. I have been a certified instructor of correctional curriculum since 1985. I have been certified by the Federal Bureau of Investigation (FBI) as a firearms instructor and by the Federal Bureau of Prisons (BOP) as a defensive tactics instructor. I have taught and consulted for the National Institute of Corrections (NIC) since 1990, the American Jail Association (AJA) since 2004, and other criminal justice system consulting agencies. I have assisted in developing policies and procedures for jails throughout the country. I have conducted numerous classification system evaluations of mega-jails, large jails, medium jails, and small jails in various states around the U.S. for the National Institute of Corrections (NIC) and other contractors. I have experience in matters involving overall jail management including, but not limited to, such areas as the use

of force; issues of security and operations; the provision of medical and mental health services; classification and inmate behavior management; contract management for privatized services (food, medical, mental health); management information systems; strip search; gang and security threat group management in jails. I co-created and developed a new jail management paradigm – Mission-Based Management. I received a Bachelor of General Studies in Social and Political Theory and a Doctorate in Public Administration. I am a member of the American Jail Association and was on the Board of Directors, serving as Second Vice-President on the Executive Board. I am a faculty member and on the Americans for Effective Law Enforcement (AELE) Board of Directors. I instruct at seminars on Inmate Classification, in-custody death prevention, Prison Rape Elimination Act. I serve on the Editorial Board for AELE's publications. I am a faculty member and on the Board of Directors of the Institute for the Prevention of In-Custody Deaths (IPICD).

In recent years, I have become involved in litigation consultation and expert witness work for both the plaintiff and the defense. These cases primarily involved strip search, classification, use of force, medical care, in-custody deaths, and conditions of confinement. Accordingly, I give my opinions within a reasonable degree of professional certainty in those areas involving jail, and correctional issues, acceptable correctional practice, correctional administration, and correctional supervision.

## III. PUBLICATIONS

1. "A New Strip Search Paradigm," Leach, Donald and Sabbatine, Ray, American Jails, Hagerstown: November/December 1996
2. "Journey into Objective Jail Classification," Leach, Don and Sabbatine, Ray, American Jails, Hagerstown: January 1999
3. "Mission Creep and the Role of the Jail in Public Health Policy," LJN Exchange, National Institute of Corrections, US Department of Justice, 2004
4. "Creating a New Jail Management Paradigm," Kennedy-Western University, Published Dissertation, 2004
5. "Are Tasers in Jails a Great New Tool or Another Headache," LJN Exchange, National Institute of Corrections, US Department of Justice, 2006
6. "Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails," LJN Exchange, National Institute of Corrections, US Department of Justice, 2006
7. "Excited Delirium: Fact or Fiction," LJN Exchange, National Institute of Corrections, US Department of Justice, 2007
8. "Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails," Corrections Professional, November 2007
9. "Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails," American Jails, Hagerstown: November/December 2007
10. "Carrots versus Sticks: Managing Behavior in the Jail," Correctional Managers Report, April/May 2008
11. "PREA Draft Standards are PREA 'DAFT" Standards," Correctional Managers Report, August 2008
12. "Carrots versus Sticks: Managing Behavior in the Jail," American Jails, Hagerstown: November/December 2008
13. "Prison Rape Elimination Act Lives On," Correctional Managers Report, December/January 2009
14. "PREA Redux: What's It Going to Cost?" Correctional Law Reporter, December/January 2010
15. "PREA Redux: What's It Going to Cost Us?" American Jails, Hagerstown: May/June 2010
16. "Arrestee Strip Searches: An Administrator's View," Correctional Law Reporter, July/August 2010
17. "The Use of Force Continuum: Is it Worth Keeping? (Part 1)," Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, December/January 2011
18. "The Use of Force Continuum: Is it Worth Keeping? (Part 1)," Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, May/June 2011

## IV. COMPENSATION

My retainer is $5,000.00. The rate of compensation is $250.00 per hour for document and materials review, research, consultation. Expert reports will be completed at the rate of $250 per hour, which will be in addition to the minimum file review fee of $5,000. The fee for depositions is $2,500.00 for the first 5-hours and $400 per hour for any subsequent time (video depositions are $3500 for the first 5-hours and $400 per hour for any subsequent time) with a maximum of seven (7) hours of testimony per day. Trial testimony is $3,500.00 for each day or portion of a day testifying. Site visits or days waiting to testify are billed at $1,000.00 per day plus all reasonable expenses (hotel, travel, rental vehicle, meals, printing, and duplication). Fees for travel, deposition, awaiting trial, and trial testimony require payment in advance of the event.

## V. CASE HISTORY DISCLOSURE

Cases in which I have testified in court or deposition in the past four years:

1. *Nick J. Epps, v. Gary Ferguson, et al.,* Bell Circuit Court, Commonwealth of Kentucky, 17-CI-00388 (07/2021) ***Plaintiff-Medical Care***
2. *Estate of Brianna Lynn Beland v. Charleston County Sheriff's Office, et al.,* Court of Common Pleas, Charleston, 2019-CP-10-1809 (06/2021) ***Defense-Medical Care/In-custody Death***
3. *S.L.C., S.E.R., S.A.L.M. v. Polk County Sheriff's Department and Darryl Christensen*, U. S. District Court, Western District of Wisconsin,. 3:16-CV-00630-WMC, 3:16-CV-00631-WMC and 3:16-CV-00632-WMC (04/2021) ***Defense-Failure to Protect/PREA Issues***
4. *Carol Herriges v. County of Macomb, et al.,* U. S. District Court, Eastern District,. 19-cv-12193 (11/2020) ***Plaintiff-Suicide***
5. *Pia Sacchetta v. Lake County Sheriff, Peyton C. Grinnell, et al.,* Circuit Court of the Fifth Judicial Circuit, Lake County, Florida, 5:19-CV-00561-JSM-PRL (10/2020) ***Plaintiff-Medical Care/In-custody Death***
6. *Amy Hill v. Okmulgee County Criminal Justice Authority, et al.,* U. S. District Court of Oklahoma, Eastern District, 18-394-SPS (05/2020) ***Plaintiff-Use of Force***
7. *Joshua Reece vs.Shelby County, Kentucky D/B/A Shelby County Detention Center, et al.,* U. S. District Court, Eastern District of Kentucky, Frankfort Division, 3:16-CV-69-GFVT (03/2020) ***Defense-Staff Misconduct***
8. *Euron Matthew v.Jake Debus, et al.,* U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-CV-06003 (02/2020) ***Plaintiff-Use of force***
9. *Kevin Younger v. Jemiah L. Green,* U.S. District Court, District of Maryland, 24-C-17-0047S2 OC (01/2020) ***Plaintiff-Use of Force/Staff Misconduct***
10. *Euron Matthew v.Jake Debus, et al.,* U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-CV-06003 (01/2020) ***Plaintiff-Use of Force***
11. *Kevin Younger v. Jemiah L. Green,* U.S. District Court, District of Maryland, 24-C-17-0047S2 OC (10/2019) ***Plaintiff-Use of Force/Staff Misconduct***
12. *William Dillon, et al., v. Clackamas County and Craig Roberts,* U.S. District Court, District of Oregon, 3:14-cv-820-YY (07/2019) ***Plaintiff-Strip Search***
13. *Kevin Younger v. State of Maryland,* Circuit Court for Baltimore City, 24-C-17-0047S2 OC (06/2019) ***Plaintiff-Use of Force/Staff Misconduct***
14. *Darcy Corbitt, Destiny Clark and John Doe v. Hal Taylor, Charles Ward, Deena Pregno and Jeanne Eastman,* U. S. District Court, Middle District of Alabama, Northern Division, 2:18-cv-00091-MHT-GMB (12/2018) ***Defense-Transgender Management Issues***
15. *Donald J. Hinson v. Sheriff Grady Judd; et al.,* U. S. District Court, Middle District of Florida, Tampa Division, 8:17-CV-02039-JDW-MAP (10/2018) ***Plaintiff-Failure to Protect/Classification Issues***
16. *Solomon Cindea v. Matthew Abbott, et al.,* U. S. District Court, Northern District of Ohio, Eastern Division, 4:17-cv-02525 (09/2018) ***Plaintiff-Use of Force/Staff Misconduct***

17. *Debra Hopkins v. Board of Wilson County, Kansas, Commissioners, et al.,* U.S. District Court, District of Kansas, 2:15-CV-2071-CM-GLR (08/2018) ***Defense-Medical Care/In-custody Death***

18. *Michelle Kindoll, v. Southern Health Partners, et al.,* U. S. District Court, Eastern District of Kentucky, Northern Division at Covington, 2:17-CV-84-DLB-JGW (07/2018) ***Plaintiff-Medical Care***

19. *Rachel M. Hammers v. Douglas County, et. al,* U.S. District Court, District of Kansas, 2:15-CV-07994-CM-KGG (06/2018) ***Defense-Medical Care/In-custody Death***

20. *Steven C. Smith v. Travis Turner, et al.,* U. S. District Court, Southern District of Alabama, 1:15-CV-371-CG-C (02/2018) ***Plaintiff-Use of Force/Staff Misconduct***

21. *James Barnes v. Sheriff John T. Boyd, LaPorte County Sheriff's Department, LaPorte County et al.,* U. S. District Court, Northern District of Indiana, 3:16-CV-00190-RLM-MGG (01/2018) ***Defense-Medical Care/In-custody Death***

22. *Robert Moore v. Mason County, Kentucky and Mason County, et al.,* U. S. District Court, Eastern District of Kentucky, 2:16-CV-00185-DLB-CJS ( 01/2018) ***Defense-Employment Issues***

23. *Randy S. Hisey, for James Merchant v. Woodbury County; et al.,* U. S. District Court, Northern District of Iowa, Western Division, 7C16-CV-4111 (11/2017) ***Defense-Medical Care***

24. *Taylor Martin v. Miguel Huapilla, Dayton Gaston, Joseph Peaks and Michael Scott,* U. S. District Court, Middle District of Florida, 2:16-cv-537-FTM-99MRM (08/2017) ***Defense-Use of Force/Medical Care***

25. *Jose Luis Garza v. City of Donna, Texas,* U.S. District Court, Southern District of Texas, McAllen Division, 7:16-CV-00558 (05/2017) ***Plaintiff-Suicide***

26. *Anthony Waller v. Bradley Lovinger,* U.S. District Court, District of Colorado, 14-CV-02109-WYD-NYW (05/2017) ***Plaintiff-Use of Force/Staff Misconduct***

27. *Bradley Johansen v. Officer A.J. Cox and the City of Kent,* U.S. District Court, Western District of Washington at Seattle, 216-CV-004160 (01/2017) ***Defense-Use of Force***

28. *Rachel M. Hammers v. Douglas County, et. al,* U.S. District Court, District of Kansas, 2:15-CV-07994-CM-KGG (08/2016) ***Defense-Medical Care/In-custody Death***

## VI. MATERIALS REVIEWED

I reviewed the following materials in formulating my opinion in this case.

1. Appendix 1-Securus Call Log-Clinard
2. Audio Recordings-Securus Inmate Telephone System
   - 2.1. 10.91.0.21-0927fff60a5b00150526e423dbfa4b0c 8-55am.mp3
   - 2.2. 10.95.0.21-09c9af1d0a5f00156ee38785d502780d 7-3-17 11-52am.mp3
   - 2.3. 10.96.0.21-0a9187d20a60001532e1a25d6cf00dcf 7-3-17 3-28pm.mp3
   - 2.4. 10.96.0.21-09e959ae0a60001532e1a25d99ef1bff 7-3-17 12-24pm.mp3
   - 2.5. 10.97.0.21-0aadf0a20a610015255722d7c06211ce 7-3-17 4-01pm.mp3
   - 2.6. 10.98.0.21-09025dff0a6200154403e3a54a5c33b0 7-3-17 8-14am.mp3
3. Audio Statement-Bothell Police Department Case Number 17-13532
   - 3.1. Conover, Forrest dated 06/30/2017; 0945 hours
   - 3.2. Elson, Dave dated 06/21/2017; 1322 hours
   - 3.3. Giger, Rhonda L. dated 06/17/2017; 0928 hours
   - 3.4. Hakim, Ayman dated 06/28/2017; 0944 hours
   - 3.5. Harper, Mia P. dated 06/19/2017; 0855 hours
4. Autopsy Report, King County Medical Examiner-Richard C. Harruff, MD, PhD dated 07/26/2017
5. Booking Record-Clinard, Michael dated 07/03/2017; 1924 hours
6. Booking Information, booking Number 217008006
   - 6.1. Booking Card
   - 6.2. Booking Sheet dated 03/22/2017; 0717 hours
   - 6.3. Deferral Screening
   - 6.4. Fingerprint Card
   - 6.5. ITR Release Checklist
   - 6.6. Order of Release/Order Setting Bail, Case Number 623217 dated 03/23/2017
   - 6.7. Record of Property Removal
   - 6.8. Strip Search Record
   - 6.9. Superform, Case Number 2017-100318 dated 03/22/2017; 0102 hours
7. Booking Information, booking Number 217015516
   - 7.1. Bond Receipt dated 05/30/2017
   - 7.2. Booking Card

7.3. Booking Sheet dated 05/30/2017; 1749 hours

7.4. Deferral Screening

7.5. Fingerprint Card

7.6. ITR Release Checklist

7.7. Permit for Special Items

7.8. Order of Release/Order Setting Bail, Case Number 623907 dated 05/30/2017

7.9. Record of Property Removal

7.10. Strip Search Record

7.11. Superform, Case Number 623907 dated 05/30/2017; 1449 hours

8. Booking Information, booking Number 217017020

8.1. Arrest Warrant dated 06/14/2017

8.2. Booking Card

8.3. Booking Sheet dated 06/12/2017; 1455 hours

8.4. Bothell Municipal Court, Case Number 31095 dated 06/12/2017

8.5. Certification for Determination of Probable Cause, Case Number 17-13532

8.6. Conditions of Release date 06/13/2017

8.7. Court Appearance Order, Case Number 623907 dated 06/13/2017

8.8. Deferral Screening

8.9. Fingerprint Card

8.10. ITR Release Checklist

8.11. Order of Release/Order Setting Bail, Case Number 623907 dated 06/29/2017

8.12. Permit for Special Items

8.13. Record of Property Removal

8.14. Statement of Probable Cause: Non-VUCSA dated 06/12/2017; 1110 hours

8.15. Strip Search Record

8.16. Superform, Case Number 17-13532 dated 06/12/2017; 1110 hours

9. Bothell Municipal Court

9.1. Order for DMHP, Case Number 31095 dated 06/13/2017

9.2. Order Setting Conditions of Release, Case Number 31095 dated 06/12/2017

10. Complaint Violation of Court Order/DV, Case Number 617025745 dated 05/25/2017

11. Call Log, Securus Inmate Telephone System-Clinard, Michael from 06/12/2017 to 07/03/2017

12. Case Investigation Report, Seattle Police Department, Number 2017-240752, Detective Britt Kelly, "In Custody Death - King County Correctional Facility," dated 07/03/2017

13. Case Report, Bothell Police Department

    13.1. Case Number 2017-00004566, filed 03/20/2017

    13.2. Case Number 2017-00013532 dated 06/15/2017; 1605 hours

        13.3. Odegaard printed 05/14/2021; 1342 hours

        13.4. Thorgrimson, Michelle printed 05/14/2021; 1342 hours

14. Criminal Case History-Clinard, Michael Travis dated 07/03/2017; 2044 hours

15. DAJD Classification system General Inquiry dated 07/05/2017; 0749 hours

16. DAJD Policy Index

17. Death Investigation Clinard, Michael T., Allen, M. Sergeant

18. Declaration of Diana Spak dated 12/29/2020

19. Defendant King County's First Interrogatories and Requests for Production to Plaintiff Tom Montgomery, as Personal Representative of the Estate of Michael Travis Clinard and Jennifer Montgomery and Answers Thereto filed 04/21/2021

20. Depositions and Exhibits

    20.1. Brent, Sueanne dated 04/22/2021

        20.1.1. Exhibit A-Medical Records, King Health Information Management Services-Clinard, Michael Travis

        20.1.2. Exhibit B-Deferral Screening dated 06/12/2017

        20.1.3. Exhibit C-Nursing Performance Appraisal dated 10/15/2008

        20.1.4. Exhibit D-Email dated 09/17/2020; 1418 hours, to Golan, Alex from Brent, Sueanne, "Loudermill decision letter"

    20.2. Gulick, Paul dated 05/06/2021

        20.2.1. Exhibit A-Medical Records, King Health Information Management Services-Clinard, Michael Travis

        20.2.2. Exhibit B-Review of Significant Events (Critical Incident Review-CIR) dated 08/10/2017

        20.2.3. Exhibit C-Email dated 07/10/2017; 0926 hours, from Mitchell, Runette to Kintner, Ron, "FW: Subscription Report-SuicideReportingInmateList generated 07/10/2017; 2:00:04"

        20.2.4. Exhibit D-"Suicide Prevention Training," Powerpoint .pdf revised 12/14/2011

    20.3. Homer, Catherine dated 04/21/2021

20.3.1. Exhibit A-Medical Records, King Health Information Management Services-Clinard, Michael Travis

20.3.2. Exhibit B-Review of Significant Events (Critical Incident Review-CIR) dated 08/10/2017

20.3.3. Exhibit C-Memorandum, from Deb Nanson, PHSS to Cate Homer, "Notification of Expectations," dated 08/01/2002

20.3.4. Exhibit D-Letter, from Gregory Kipp to Catherine Homer dated 12/15/2003

20.4. Kilbourne, Michael dated 04/28/2021

20.4.1. Exhibit 1-Flowchart, "Psych Services/DAJD, Stream Current State, June 2012,"

20.4.2. Exhibit 2-Medical Records, King Health Information Management Services-Clinard, Michael Travis

20.4.3. Exhibit 3-Deferral Screening dated 06/12/2017

20.4.4. Exhibit 4-Order Setting Conditions of Release filed 06/12/2017

20.4.5. Exhibit 5-Review of Significant Events (Critical Incident Review-CIR) dated 08/10/2017

20.5. Peterson, Lisa dated 04/27/2021

20.5.1. Exhibit A-Deferral Screening dated 06/12/2017

20.5.2. Exhibit B-Medical Records, King Health Information Management Services-Clinard, Michael Travis

20.5.3. Exhibit D-"Treatment of Non-Pregnant Patients with a History of Benzodiazepine use/abuse/dependance," Clinical Practice Guideline, Jail Health Services updated 01/15/2020

20.6. Sanders, Benjamin dated 05/13/2021

20.6.1. Exhibit J-Medical Records, King Health Information Management Services-Clinard, Michael Travis

20.6.2. Exhibit E-Deferral Screening dated 06/12/2017

20.6.3. AMR Seattle Operations, Pre-Hospital Care Report, Case Number 1038855 dated 03/22/2017

20.6.4. Exhibit I-Deferral Screening dated 06/12/2017

20.6.5. Exhibit I-"Treatment of Non-Pregnant Patients with a History of Benzodiazepine use/abuse/dependance," Clinical Practice Guideline, Jail Health Services updated 01/15/2020

20.6.6. Exhibit K-Declaration of Diana Spak dated 12/29/2020

20.6.7. Exhibit L-Review of Significant Events (Critical Incident Review-CIR) dated 08/10/2017

20.6.8. Exhibit M-Email dated 10/05/2017; 1033 hours, from Velez, Nick to Karlsson, gordon, "CIR Follow-Up Status"

20.6.9. Exhibit N-Statement Forms, Continuation Sheets, Number 2017240752

20.6.9.1. Harris, Delaney

20.6.9.2. Martin, Kelli

20.6.9.3. Peterson, Justin

20.6.9.4. Wesch, Joel

21. Domestic Violence No Contact Order, Bothell Municipal Court, Case Number 31095 filed 03/28/2017

22. Emails

22.1. Dated 07/03/2017; 2123 hours, from 4d@kingcounty.com to Frary, Benjamin, "A first report via the web has been submitted"

22.2. 07/05/2017; 1135 hours, from Murphy, Julie on behalf of DAJD GIB to Alejandro, Tobias; Allen, Marquel; Armatis, Tamara; Awabdy, Tarek; Bernitt, Justin E; Bratton, Kelli (Peck); Brown, Elizabeth-AFIS; Cooper, Claudette; Danforth, Bill; Dansky, Laura; DeRise, Carla; Dustin Frederick (dustin@1ocal5l9.org); Fields, Michael; Foster, Rick; Gillespie, Carol; Guidry, Felicia; Herzer, Pascal; Ingram, Jennifer L; Johnson, Neil; Lyne, Pamela; Pine, Bette; Sample, Monica J; Scairpon, Mark R; Shindo, Christopher Y; Shirey, Eric; Smith, Andrea N.; Tamura-Deering, Jody; Thomas, LaDene; Trinh, Loi; Velez, Nick; Watkins, Diana; ZZDept, Adult & Juvenile Detention, "DAJD GIB #2017 - 073"

22.3. 07/06/2017; 1249 hours from Hayes, William to Urie, Eric; Allen, Michael, "FW: jail death on hotline this afternoon"

22.4. Dated 07/12/2017; 1109 hours from Kelly, Britt to Allen, Michael, "AED Defibrillator Recording"

22.5. Dated 07/19/2017; 1123 hours, from Allen, Michael to McGuire, Terry, "Clinard, Michael 01/02/1979"

22.6. Dated 07/19/2017; 1636 hours, from Alexander, Mary Jane to Allen Michael, "RE: Clinard, Michael 01/02/1979"

22.7. Dated 07/27/2017; 1549 hours, from maryjane.alexander@kingcounty.gov to Michael.Allen@kingcounty.gov, "RE: Request for Audio Recordings"

22.8. Undated from Allen, Michael to Tewey, Terri, "Clinard, Michael 217017020

23. First Amended Complaint Jury Demanded filed07/14/2020

24. Force Investigation Report, Seattle Police Department, Number 2017-240752, Captain Steve Hirjak, "Unintentional Discharge of a Firearm," dated 02/06/2018

25. "Future Orientation Moderates the Relationship Between Functional Status and suicide Ideation in Depressed Adults," Jameson K. Hirsch, Ph.D., Paul R. Duberstein, Ph.D., Kenneth R. Conner, Psy.D., M.P.H., Marnin J. Heisel, Ph.D., Anthony Beckman, B.S., Nathan Franus, M.S., and Yeates Conwell, M.D., *Depression and Anxiety* 24:196–201 (2007)

26. General Offense Hardcopy, Seattle Police Department dated 03/27/2017

27. Incident Report, Sheriff, King County, C17025745 dated 05/23/2017; 1219 hours
28. Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752
    - 28.1. Adan, Yahya dated 07/03/2017; 2245 hours
    - 28.2. Anderson, David dated 04/03/2017; 2230 hours
    - 28.3. Harris, Delaney dated 07/03/2017; 2148 hours
    - 28.4. Jones, William M. dated 07/03/2017; 2204 hours
    - 28.5. MacDonald, William dated 07/03/2017; 2236 hours
    - 28.6. McCoy, Michael dated 07/03/2017; 2315 hours
    - 28.7. Ogdon, Cody dated 07/03/2017; 2245 hours
    - 28.8. White, Thomas J dated 07/03/2017; 2146 hours
    - 28.9. Williams, Lelbert L. dated 07/03/2017
29. Jail Incident Report-Allen, Myron dated 07/03/2017; 2200 hours
30. KCCF-2: Incident Tracking & Roster Notes for 7/3/2017, Incident Record 17-1249-New RMS
31. King County Correctional Facility Shift Log dated 07/03/2017
32. King County Crisis and Commitment Services
    - 32.1. Intake Form dated 06/14/2017;1758 hours
    - 32.2. Documentation of Face to Face Assessment dated 06/15/2017
    - 32.3. Investigation
        - 32.3.1. Dated 06/14/2017
        - 32.3.2. Dated 06/14/2017; 2300 hours
        - 32.3.3. Dated 06/16/2017; 0450 hours
33. Letters
    - 33.1. Dated 07/10/2017, from King Health Information Management Services Department to Sergeant Michael Allen, "RE: Medical Records of Michael Travis Clinard (B.D. 1/2/1979)"
    - 33.2. Dated 07/28/2017, to Commander Gordon Karlsson from Kimberly Mosolf, Disability Rights Washington
34. Logbook starting entry dated 07/03/2017; 1245 hours
35. Major Investigation Summary, Compliance and Professional Standards Bureau, Seattle Police Department, Number 2017-240772, "In-Custody Death," dated 07/03/2017; 1830 hours
36. Medical Records-King Health Information Management Services Department
    - 36.1. Deferral Form
        - 36.1.1. Dated 03/22/2017

36.1.2. Dated 05/30/2017

36.2. Medical Kite

36.2.1. Dated 03/23/2017

36.2.2. Dated 06/18/2017

36.2.3. Dated 06/19/2017

36.2.4. Dated 06/23/2017

36.3. Medication Administration Record

36.3.1. From 06/13/2017 to 06/30/2017

36.3.2. From 07/01/2017 to 07/03/2017

36.4. Medication Not Administered Log dated 06/28/2017; 0950 hours

36.5. Reverse Kite, Jail Health Services Communication to Inmate

36.5.1. Dated 03/23/2017

36.5.2. Dated 06/03/2017

36.6. Progress Notes

36.6.1. Dated at 03/22/2017; 2028 hours-Nellie Ohannes, RN

36.6.2. Dated 03/23/2017; 1302 hours-Jeffrey Powell

36.6.3. Dated 03/23/2017; 1600 hours-Roger Higgs, MD

36.6.4. Dated 06/12/2017; 1445 hours-Stuart Hanney, RN

36.6.5. Dated 06/13/2017; 1144 hours-Catherine Homer, LPN

36.6.6. Dated 06/13/2017; 1159 hours-Lisa Peterson, ARNP

36.6.7. Dated 06/14/2017; 1742 hours-Michael Kilbourne, LMHC

36.6.8. Dated 06/21/2017; 1541 hours-Benjamin Sanders, MD

36.6.9. Dated 06/21/2017; 1541 hours-Behauden Omer, RN

36.6.10. Dated 06/24/2017; 1208 hours-Sueanne Brent, RN at

36.6.11. Dated 06/24/2017; 1340 hours-Melissa Fukunaga, ARNP

36.6.12. Dated 07/03/2017; 2002 hours-Jenise Temko, RN

36.6.13. Dated 07/05/2017; 0711 hours-Chris Haguewood, LMHC at

36.6.14. Dated 08/08/2017; 1348 hours-Chris Haguewood, LMHC

36.6.15. Dated 06/10/2018; 1639 hours-Paul Gulick, LICSW

36.6.16. Dated 03/23/2018 1134 hours-Sean Dumas, RN

37. Memorandum

37.1. Dated 09/20/2017, from Sergeant Mohamed Eltay to Major Todd Clark, "Re: Inmate Clinard, Michael (BA#217017020; IT#l 7-1249)-Medical Status"

37.2. Dated 10/02/2017, from Sergeant Michael Fasen to Major Todd Clark, "Involvement in incident IT#17-1249 Mr. Clinard BA# 217017020 on July 03, 2017"

37.3. Dated 03/01/2018, from Sergeant Michael R. Allen to Commander G. Karlsson, "Death Investigation of Michael Travis Clinard,"

38. Municipal Court of Seattle No Contact Order, Case Number 623907 dated 05/24/2017; 1306 hours

39. Officer Interviews-Audio Recording and Transcribed, Case Number 2017-240752

39.1. Allen, Myron dated 08/14/2017; 1450 hours

39.2. Currier, Andrew dated 07/03/2017; 2100 hours

39.3. Spicer, Damian dated 07/03/2017; 2101 hours

40. Officer's Report, Incident Number 17-1249

40.1. Awasthi, A. dated 07/03/2017; 2033 hours

40.2. Currier, Andrew dated 07/04/2017; 1500 hours

40.3. Julius dated 07/03/2017; 2006 hours

40.4. Lee dated 07/03/2017; 1933 hours

40.5. Paget dated 07/03/2017; 2100 hours

40.6. Spicer, Damian dated 07/03/2017; 2207 hours

40.7. West, M. dated 07/03/2017; 2100 hours

41. "Pharmacy and Medication Administration Manual," Jail Health Services, Public Health-Seattle & King County dated 11/2016

42. Photographs

42.1. Courtroom Assault-Bothell Police Department, Case Number 17-13532 dated 06/15/2017-Smith

42.1.1. IMG_0254.JPG

42.1.2. IMG_0255.JPG

42.1.3. IMG_0256.JPG

42.1.4. IMG_0257.JPG

42.1.5. IMG_0258.JPG

42.1.6. IMG_0259.JPG

42.1.7. IMG_0260.JPG

42.1.8. IMG_0261.JPG

42.1.9. IMG_0262.JPG

42.1.10. IMG_0263.JPG

42.1.11. IMG_0264.JPG

42.1.12. IMG_0265.JPG

42.1.13. IMG_0266.JPG

42.1.14. IMG_0267.JPG

42.1.15. IMG_0268.JPG

42.1.16. IMG_0269.JPG

42.1.17. IMG_0325.JPG

42.1.18. IMG_0326.JPG

42.1.19. IMG_0327.JPG

42.1.20. IMG_0328.JPG

42.1.21. IMG_0329.JPG

42.1.22. IMG_0330.JPG

42.1.23. IMG_0331.JPG

42.1.24. IMG_0332.JPG

42.1.25. IMG_0333.JPG

42.1.26. IMG_0334.JPG

42.1.27. IMG_0335.JPG

42.1.28. IMG_0336.JPG

42.1.29. IMG_0337.JPG

42.1.30. IMG_0338.JPG

42.1.31. IMG_0339.JPG

42.2. King County Correctional Facility

42.2.1. IMG_0002.JPG

42.2.2. IMG_0003.JPG

42.2.3. IMG_0004.JPG

42.2.4. IMG_0005.JPG

42.2.5. IMG_0006.JPG

42.2.6. IMG_0007.JPG

42.2.7. IMG_0008.JPG

42.2.8. IMG_0009.JPG

42.2.9. IMG_0010.JPG

42.2.10. IMG_0011.JPG

42.2.11. IMG_0012.JPG

42.2.12. IMG_0013.JPG

42.2.13. IMG_0014.JPG

42.2.14. IMG_0015.JPG

42.2.15. IMG_0016.JPG

42.2.16. IMG_0017.JPG

42.2.17. IMG_0018.JPG

42.2.18. IMG_0019.JPG

42.2.19. IMG_0020.JPG

42.2.20. IMG_0021.JPG

42.2.21. IMG_0022.JPG

42.2.22. IMG_0023.JPG

42.2.23. IMG_0024.JPG

42.2.24. IMG_0025.JPG

42.2.25. IMG_0026.JPG

42.2.26. IMG_0027.JPG

42.2.27. IMG_0028.JPG

42.2.28. IMG_0029.JPG

42.2.29. IMG_0030.JPG

42.2.30. IMG_0031.JPG

42.3. King County Medical Examiner's Office-Clinard, Michael Travis

42.3.1. 17-1318x01.jpg

42.3.2. 17-1318x02.jpg

42.3.3. 17-1318x03.jpg

42.3.4. 17-1318x04.jpg

42.3.5. AUT_6685.JPG

42.3.6. AUT_6686.JPG

42.3.7. AUT_6687.JPG

42.3.8. AUT_6688.JPG

42.3.9. AUT_6689.JPG

42.3.10. AUT_6690.JPG

42.3.11. AUT_6691.JPG

42.3.12. AUT_6692.JPG

42.3.13. AUT_6693.JPG

42.3.14. AUT_6694.JPG

42.3.15. AUT_6695.JPG

42.3.16. AUT_6696.JPG

42.3.17. AUT_6697.JPG

42.3.18. AUT_6698.JPG

42.3.19. AUT_6729.JPG

42.3.20. AUT_6730.JPG

42.3.21. AUT_6731.JPG

42.3.22. AUT_6732.JPG

42.3.23. AUT_6733.JPG

42.3.24. AUT_6734.JPG

42.3.25. AUT_6735.JPG

42.3.26. AUT_6736.JPG

42.3.27. AUT_6737.JPG

42.3.28. AUT_6738.JPG

42.3.29. AUT_6739.JPG

42.3.30. AUT_6740.JPG

42.3.31. AUT_6741.JPG

42.3.32. AUT_6747.JPG

42.3.33. AUT_6748.JPG

42.3.34. AUT_6749.JPG

42.3.35. AUT_6750.JPG

42.3.36. AUT_6751.JPG

42.3.37. AUT_6752.JPG

42.3.38. AUT_6753.JPG

42.3.39. AUT_6754.JPG

42.3.40. AUT_6755.JPG

42.3.41. AUT_6756.JPG

42.3.42. AUT_6757.JPG

42.3.43. AUT_6758.JPG

42.3.44. AUT_6759.JPG

42.3.45. AUT_6760.JPG

42.3.46. AUT_6761.JPG

42.3.47. AUT_6762.JPG

42.3.48. AUT_6763.JPG

42.3.49. AUT_6764.JPG

42.3.50. AUT_6765.JPG

42.3.51. AUT_6766.JPG

42.3.52. AUT_6767.JPG

42.3.53. AUT_6768.JPG

42.3.54. AUT_6769.JPG

42.3.55. AUT_6770.JPG

42.3.56. AUT_6771.JPG

42.3.57. AUT_7490.JPG

42.3.58. AUT_7491.JPG

42.3.59. AUT_7492.JPG

42.3.60. AUT_7493.JPG

42.3.61. AUT_7494.JPG

42.3.62. AUT_7495.JPG

42.3.63. AUT_7496.JPG

42.3.64. AUT_7497.JPG

42.3.65. AUT_7498.JPG

42.3.66. AUT_7499.JPG

42.3.67. YEL_5222.JPG

42.3.68. YEL_5223.JPG

42.3.69. YEL_5224.JPG

42.3.70. YEL_5225.JPG

42.3.71. YEL_5226.JPG

42.3.72. YEL_5227.JPG

42.3.73. YEL_5228.JPG

42.3.74. YEL_5229.JPG

42.3.75. YEL_5230.JPG

42.3.76. YEL_5231.JPG

42.3.77. YEL_5232.JPG

42.3.78. YEL_5233.JPG

42.3.79. YEL_5234.JPG

42.3.80. YEL_5235.JPG

42.3.81. YEL_5236.JPG

42.3.82. YEL_5237.JPG

42.3.83. YEL_5238.JPG

42.3.84. YEL_5239.JPG

42.3.85. YEL_5240.JPG

42.3.86. YEL_5241.JPG

42.3.87. YEL_5242.JPG

42.3.88. YEL_5245.JPG

42.3.89. YEL_5246.JPG

42.3.90. YEL_5247.JPG

42.3.91. YEL_5248.JPG

42.3.92. YEL_5249.JPG

42.3.93. YEL_5250.JPG

42.3.94. YEL_5251.JPG

42.3.95. YEL_5252.JPG

42.3.96. YEL_5254.JPG

42.3.97. YEL_5255.JPG

42.3.98. YEL_5256.JPG

42.3.99. YEL_5257.JPG

42.3.100. YEL_5259.JPG

42.3.101. YEL_5260.JPG

42.3.102. YEL_5262.JPG

42.3.103. YEL_5263.JPG

42.3.104. YEL_5266.JPG

42.3.105. YEL_5267.JPG

42.3.106. YEL_5270.JPG

42.3.107. YEL_5271.JPG

42.3.108. YEL_5272.JPG

42.3.109. YEL_5273.JPG

42.3.110. YEL_5274.JPG

42.3.111. YEL_5275.JPG

42.3.112. YEL_5276.JPG

42.3.113. YEL_5277.JPG

42.3.114. YEL_5278.JPG

42.3.115. YEL_5280.JPG

42.3.116. YEL_5281.JPG

42.3.117. YEL_5282.JPG

42.3.118. YEL_5283.JPG

42.3.119. YEL_5284.JPG

42.3.120. YEL_5285.JPG

42.3.121. YEL_5286.JPG

42.3.122. YEL_5287.JPG

42.3.123. YEL_5288.JPG

42.3.124. YEL_5289.JPG

42.3.125. YEL_5290.JPG

42.3.126. YEL_5291.JPG

42.3.127. YEL_5292.JPG

42.3.128. YEL_5293.JPG

42.3.129. YEL_5294.JPG

42.3.130. YEL_5295.JPG

42.3.131. YEL_5296.JPG

42.3.132. YEL_5297.JPG

42.3.133. YEL_5298.JPG

42.3.134. YEL_5299.JPG

42.3.135. YEL_5300.JPG

43. Policy & Operating Procedures-Jail Health Services, Public Health-Seattle & King County

    43.1. "Basic Mental Health Services," "Section "Special Needs and Services," updated 11/18/2016

    43.2. "Communication on Patients' Health Needs," Section "Governance and Administration," updated 11/18/2016

    43.3. "Emergency Response Plan," "Section "Governance and Administration," updated 11/18/2016

    43.4. "Emergency Services," "Patient Care and Treatment," updated 11/18/2016

    43.5. "Mental Health Screening and Evaluation," "Patient Care and Treatment," updated 11/18/2016

    43.6. "Suicide Prevention Program," "Special Needs and Services," updated 11/18/2016

44. Pre-Executive Briefing Information-Clinard, Michael Travis (217017020)

45. "Prescribing Guidelines for Psychiatric Medications Used by Jail Health Services," Jail Health Services, Public Health-Seattle & King County effective date 03/12/2017

46. Quality Improvement Reports-Jail Health Services

    46.1. September 2012-September 2013 EPAS, Benjamin L. Sanders, end of cycle August 13, 2013

    46.2. September 2013-September 2014 EPAS, Benjamin L. Sanders

    46.3. October 2014-September 2015 EPAS, Benjamin L. Sanders, updated September 2015

47. Recorded Inmate Telephone Calls, Securus Inmate Telephone System

    47.1. 10.98.0.21-09025dff0a6200154403e3a54a5c33b0 7-3-17 8-14am.mp3 ((256) 998-0257)

    47.2. 10.95.0.21-09c9af1d0a5f00156ee38785d502780d 7-3-17 8-55am.mp3 ((256) 998-0257)

    47.3. 10.95.0.21-09c9af1d0a5f00156ee38785d502780d 7-3-17 11-52am.mp3 ((256) 998-0257)

    47.4. 10.96.0.21-09e959ae0a60001532e1a25d99ef1bff 7-3-17 12-24pm.mp3 ((801) 412-6801 09)

    47.5. 10.96.0.21-0a9187d20a60001532e1a25d6cf00dcf 7-3-17 3-28pm.mp3 ((801) 412-6801 09)

    47.6. 10.97.0.21-0aadf0a20a610015255722d7c06211ce 7-3-17 4-01pm.mp3 ((256) 998-0257)

    47.7. 10.93.0.21-0b06dda00a5d001503ac8119a6cec0f6.mp3 ((256) 998-0257)

48. Roster: KCCF-2 for 07/03/2017

49. Security/Surveillance Log dated 07/03/2017

50. Site Visit-King County Correctional Facility conducted 08/03/2021

51. Superior Court of Washington, County of King

    51.1. Restraining Order, Case Number 17-3-00943-5 SEA filed 04/05/2017; 1132 hours

51.2. Order for Protection, Case Number 17-2-03740-1 SEA filed 03/22/2017; 1018 hours

52. Supervisor's Incident Report, Incident Number 17-1249-Alfred dated 07/04/2017
53. Training Records-Allen, Myron printed: KC\njudson @ 03/09/2021; 1345 hours
54. Verbatim Report of Recorded Telephone Call From King County Correctional Facility July 3, 2017

54.1. 0814 hours

54.2. 0855 hours

54.3. 1224 hours

54.4. 1601 hours

54.5. 1739 hours

55. Video Recording-Bothell PD Court Room from 11:11:21:521 AM (PDT) to 11:20:39:974 AM (PDT)
56. *Bell v Wolfish,* 441 U. S. Supreme Court, 520 (1979)
57. Core Jail Standards, 1st Edition, American Correctional Association, 2010
58. *Estelle v. Gamble,* 429 U.S. 97; 97 S. Ct. 285; 50 L. Ed. 2d 251; 1976 U.S. LEXIS 175, (1976)
59. *Farmer v Brennan,* (92-7247), 511 U.S. 825 (1994)
60. Jail and Prison Legal Issues: An Administrator's Guide, William Collins, Esq., published by the American Jail Association, updated 2006
61. Jail Design and Operation and the Constitution: An Overview, William Collins, Esq., #96-J1052 National Institute of Corrections, U.S. Department of Justice, 1998
62. Jail Design Guide: A Resource for Small and Medium-Sized Jails, Dennis A. Kimme, #94J04GHZ8, National Institute of Corrections, U.S. Department of Justice, 1998
63. Jail Design Review Handbook, Mark Goodman, Accession Number 018443 National Institute of Corrections, U.S. Department of Justice, 2003
64. *Kingsley v Hendrickson,* 14-6368, U. S. 135 S. Ct. 2466, 2015 U.S. LEXIS 4073 (2015)
65. Performance-based Standards for Adult Local Detention Facilities, 4th Edition, American Correctional Association, June 2004

    65.1. 2016 Standards Supplement, American Correctional Association, 2016

66. Standards for Health Services in Correctional Institutions, 3rd Edition, American Public Health Association, 2003
67. Standards for Health Services in Jails, National Commission on Correctional Health Care, 2008
68. The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails, William Collins, Esq., published by the Civic Research Institute, 2019
69. *Taylor v. Barkes,* 14–939 U.S. (2015)
70. *Turner v Safley,* 482 U.S. 78 482 U.S. 78 (1987)

## VII. EXHIBITS TO BE USED TO SUMMARIZE OR SUPPORT OPINIONS

I may employ some, or all, of the materials referred to in the previous section to summarize or support my opinions. This report is predicated on the facts as presented through reviewing the provided materials. Attempts are made to avoid making judgments based solely upon the involved individual's credibility.

## VIII. FOCUS OF EXAMINATION

My review focused on the following issues:

***A. Did the care and custody of Mr. Michael Travis Clinard while in the King County Correctional Facility between June 12, 2017 and July 3, 2017, meet acceptable correctional practice to prevent self-harming behavior as expected by a reasonable correctional officer and administrator?***

***B. Did the actions of Correctional Officer Myron Allen on July 3, 2017, meet acceptable correctional practice to prevent self-harming behavior as expected by a reasonable correctional officer and administrator?***

## IX. OPINION

My opinion is predicated on a comprehensive review of the information listed in Section VI. My opinions and conclusions are given within a reasonable degree of professional certainty in those areas involving jail and correctional issues, acceptable correctional practice, supervision and administration. I reserve the right to supplement or alter my opinions and conclusions should additional information be received.

*A.* ***In sum, the care and custody of Mr. Michael Travis Clinard while in the King County Correctional Facility between June 12, 2017, and July 3, 2017, met acceptable correctional practice to prevent self-harming behavior as expected by a reasonable correctional officer and administrator.***

*B.* ***In sum, the actions of Correctional Officer Myron Allen on July 3, 2017, met acceptable correctional practice to prevent self-harming behavior as expected by a reasonable correctional officer and administrator.***

## X. COMMENTS AND BASIS FOR OPINION

In preparing my opinion, I relied upon my training and experience in corrections as an officer, instructor, and administrator. In addition, I rely on training and information provided by the attorney and correctional law expert Mr. William Collins, Esq. Mr. Collins wrote the Jail and Prison Legal Issues: An Administrator's Guide[1] and The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails,[2] along with providing training through the National Institute of Corrections and American Jail Association. I rely on training and information provided by the attorney and correctional law expert Mr. William Collins, Esq. in both his Additionally, my opinions and basis for opinions reflect my continuing studies and research of correctional management issues. Those studies and research include a frequent review of case studies, correctional articles,[3] and participation in correctional conferences and workshops conducted by the Americans for Effective Law Enforcement, Institute for the Prevention of In-custody Death, the American Jail Association, and the American Correctional Association, both as a presenter and participant.

My opinions arise from the information reviewed. My opinions are the product of that review and reflect relevant professional duties, standards of care; and, accepted practices in corrections. Should additional information be disclosed that affects my opinions and conclusions, I reserve the right to alter my opinions and conclusions as necessary.

My reference to cases or use of any terms that have a specific legal definition does not intend to express any legal expertise. Instead, such legal references reflect the scope of my experiences and training as a correctional officer and correctional administrator. In operating a Constitutionally-based correctional facility, a knowledgeable correctional administrator must use those cases the Courts have determined must be used to guide our policy-making processes. These policy-making processes would include the management and oversight of secure correctional facilities and community-based correctional components, such as operating a day reporting center, adult probation services, court-ordered work-release programs.

Correctional administrators have the intended objective of operationalizing agency policies and practices to conform to Constitutionally-based duties, applicable state regulatory standards; and, standards of care and training. Supervision intends to ensure knowledge and application of those Constitutional duties by correctional staff. Agency policy is a guideline enacted through procedures that demonstrate Constitutionally-based acceptable correctional practices. The various correctional duties, standards of care, and accepted practices have all evolved, illustrating "the evolving standards of decency that mark the progress of a maturing society."

The phrase "acceptable correctional practice" refers to how objectively reasonable correctional professionals perform or should perform their duties based on legal policy codified and adopted into policy and procedure that is published, trained, and supervised. "Acceptable correctional practice" does not refer to "best practice" or "ideal practice," but instead to those situations and practices correctional personnel confront as part of their customary

[1] Jail and Prison Legal Issues: An Administrator's Guide, William Collins, Esq., published by the American Jail Association, updated 2006

[2] The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails, William Collins, Esq., published by the Civic Research Institute, 2019

[3] I routinely read and review correctional publications and articles that provide current thoughts, issues, problems, solutions and relevant case law. These publications include the *Correctional Manager's Report,* the *Correctional Health Care Report,* the *Correctional Law Reporter,* the *Correctional Mental Health Report, American Jails* magazine, Jail and Prisoner Law Bulletin, AELE Monthly Law Journal, and *Corrections Today* magazine.

duties. They generally fall within a range of options available in any given correctional case.

I relied on my training, experience and knowledge as a correctional administrator in evaluating the circumstances surrounding the care of Mr. Michael Travis Clinard while in the custody of the King County Department of Adult and Juvenile Detention.

## XI. ANALYSIS

### *A. Analysis of the Care of Mr. Michael Clinard While in the Custody of the King County Correctional Facility*

My analysis centers on the staff, administration and policies related to the care and custody of Mr. Michael Clinard while in King County Correctional Facility (KCCF) custody. My review of the materials shows that the KCCF correctional, medical and mental health care staff provided Mr. Clinard with acceptable correctional mental health care services from the time of his entry into the KCCF until his apparent spontaneous suicide on July 3, 2017. Upon entry to the KCCF, Mr. Clinard was appropriately assessed for suicidal ideation.

A qualified medical provider[4] queried Mr. Clinard for suicidal ideation. Based upon the recommendations of the qualified medical provider, Mr. Clinard was appropriately housed in a general population housing unit with a cellmate[5]. While in custody, Mr. Clinard was assessed by a qualified mental health provider during which he denied suicidal ideation. The level of mental health care provided to Mr. Clinard was exemplary given that he repeatedly denied suicidal ideation or intent throughout his custody from June 12, 2017, to July 3, 2017. The two individuals aware of the suicidal ideations he expressed on July 3, 2017, failed to notify correctional, medical, or mental health care staff of his threats. Additionally, Mr. Clinard's suicide on July 3, 2017, appears to be an emotional, spontaneous act arising from the telephone conversation between him and his mother.

### *B. Initial Entry and Provision of Care Services*

The American Correctional Association (ACA) and National Commission Correctional Health Care (NCCHC) each have recommended standards for screening of new arrestees and subsequent observations. For example, The ACA recommends ALDF 4-ALDF-4C-29[6] (screening); 4-ALDF-2A-52[7] (observations); 4-ALDF-4C-32[8] and 4-ALDF-4C-33[9] (both addressing prevention and intervention). The NCCHC recommends NCCHC J-E-02[10] (receiving screening);

---

[4] Registered Nurse Stewart Hanney

[5] Mr.Clinard's cellmate in housing unit 4E08UA, house 3 was Michael McCoy

[6] 4-ALDF-4C-29, p. 62, "All inmates receive an initial mental health screening at the time of admission to the facility by mental-health trained or qualified mental-health care personnel"

[7] 4-ALDF-2A-52, p. 28, "All special management inmates are personally observed by a correctional officer **at least every 30 minutes on an irregular schedule**. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal inmates are under continuous observation until seen by a mental health professional. Subsequent supervision routines are in accordance with that ordered by the mental health professional." (Emphasis added)

[8] 4-ALDF-4C-32, p. 64 "A suicide-prevention program is approved by the health authority and reviewed by the facility or program administrator. It includes specific procedures for handling intake, screening, identifying, and supervising of a suicide-prone inmate and is signed and reviewed annually. The program includes staff and inmate critical incident debriefing that covers the management of suicidal incidents, suicide watch, and death of an inmate or staff member. It ensures a review of critical incidents by administration, security, and health services. All staff with responsibility for inmate supervision are trained on an annual basis in the implementation of the program."

[9] 4-ALDF-4C-33, p. 64 "When standard issued clothing presents a security or medical risk, the inmate is supplied with a security garment that promotes inmate safety and prevents humiliation and degradation."

[10] NCCHC J-E-02, "Receiving Screening," p. 60, "Standard: Receiving screening is performed on all inmates on arrival at the intake facility to ensue that emergent and urgent health needs are met."

J-E-05[11] (mental health screening); and J-G-05[12] (suicide prevention). Add to these changes in ACA standards, such as the 4-ALDF-2A-52-Revised provides even less restrictive observation timeframes than ACA previously promulgated. The revised "standard" states:

> "Written policy, procedure, and practice require that all **special management inmates are personally observed by a correctional officer twice per hour, but no more than 40 minutes apart**, on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation; suicidal inmates are under continuing or continuous observation."[13] (Emphasis added)

While ACA Standards provide for "no more than 40 minutes apart" observations or an undefined "more frequent" schedule, NCCHC stipulates that compliance for them is no more than 15-minutes between checks except for "actively suicidal" inmates.

> "1. A suicide prevention program includes the following outcomes:
>
> a. facility staff identify suicidal inmates and immediately initiate precautions,
>
> b. suicidal inmates are evaluated promptly by the designated health professional who directs the intervention and assures follow-up as needed,
>
> c. actively suicidal inmates are placed on constant observation, and
>
> d. potentially suicidal inmates are monitored on an irregular schedule with **no more than 15 minutes between checks.** If, however, the potentially suicidal inmate is placed in isolation, constant observation is required."[14] (Emphasis added)

A third agency providing voluntary standards, which I am not aware of any correctional agency following, is the American Public Health Association (APHA).

> "Principle: Prisoners must be given an initial medical assessment by an independent licensed health care provider or a nurse with training and certification in physical assessment. The initial medical screening must precede any housing assignment other than designated intake housing."[15]

However, acceptable correctional practice is not determined by these recommendations, as shown in *Bell v Wolfish*, addressing input from the ACA and APHA in the conditions of confinement case *Bell v Wolfish*:

---

[11] NCCHC J-E-05, p. 67, "Mental Health Screening and Evaluation," "Standard: All inmates receive mental health screening with positive screens receive a mental health evaluation." "Compliance Indicators: 1. **Within 14 days of admission** to the correctional system, qualified mental health professional or mental health staff conduct initial mental health screening." (Emphasis added)

[12] NCCHC J-G-05, p. 100 "Standard: The facility identifies suicidal inmates and intervenes appropriately."

[13] ACA, 2014 Supplement, Standard Revised August 2011. Compare with the language in footnote 7 which is the previous "standard."

[14] NCCHC J-G-05, "Compliance Indicators," p. 100

[15] APHA Standards for Health Services in Correctional Institutions, "Continuum of Clinical Services," "A. Initial Medical Screening and Complete Medical Examination," p. 25

> "And while the recommendations of these various groups may be instructive in certain cases, **they simply do not establish the constitutional minima;** rather, they establish goals recommended by the organization in question."[16] (Emphasis added)

Thus, the standards are *advisory* for correctional administrators to consider in light of established caselaw, operational philosophy and available resourcing. The ACA standards, APHA and the NCCHC, describe what jails or prisons must do to be accredited by that organization for a fee.[17] These ACA, NCCHC and APHA standards and accreditation activities are commercial products. Separate from these voluntary standards, the USSC has said, as recently as 2015, that arrestees have no right to screening for suicide, nor has the Court ever prescribed suicide intervention protocols.[18]

While the task is left to the jail and its' provider to determine, asking new arrestees about suicidal ideation is a reasonable correctional practice. So here in Mr. Clinard's case, nevertheless, the KCCF is going beyond what the courts have said regarding querying new arrestees about suicidal ideation, and that is an excellent correctional practice. The KCCF medical provider, Public Health-Seattle & King County's Jail Health Services (JHS), has specific policies intended to ascertain whether an arrestee poses a risk for suicide at the time of intake. The Jail Health Services' has several policies stipulating that all arrestees undergo initial querying by the receiving custody staff, followed by an assessment conducted by a qualified medical provider.

"2. Identification

a. **The DAJD Pre-Booking Officer conducts deferral screening of all arrestees presented for booking into the King County Jails using a Deferral Screening Form. This form is also used to record observations of the transporting officer with respect to behavior or suicidal statements.** The DAJD officer documents his/her observations of any irrational or inappropriate behavior and records responses to the following screening questions:

i. Are you suicidal now?

ii. Have you attempted suicide within the last 12 months?

b. The Intake, Transfer and Release (ITR) nurse reviews the Deferral Screening Form and the inmate/ patient's electronic medical record (if any). S/he then assesses the individual for medical/ psychiatric risk factors and drug/alcohol withdrawal, and documents the findings in the medical record using the Receiving Screening Form (RSF). **In addition to a variety of other questions screening for the presences of possible psychiatric issues, the assessment includes a suicide risk screen that covers the following factors:**

**i. Suicidal ideation**

---

[16] *Bell v Wolfish*, 441 U. S. Supreme Court, 520 (1979), Footnote 27

[17] Accreditation is not mandatory, and only a tiny percentage of jails have elected to become accredited. According to the Bureau of Justice Statistics 2013 accounting, approximately "3,163 city, county, or privately operated jail facilities intended for adults." Of those 3,163 jails, only 164 were accredited with the American Jail Association. Approximately 0.05% of the nation's jails are actively attempting to follow ACA's recommended standards. It is noteworthy that some recommended standards apply to jails and some to prisons. This variance is because of generally very different in their size, inmate population typology and resourcing. Prison standards, practices and experiences can frequently be inapplicable to jails.

[18] See *Taylor v Barkes*, "No decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols."

**ii. Suicide attempt within last 6 months**

iii. Bizarre presentation/behavior or command hallucinations

iv. Prior suicide attempt in jail or the community and the lethality of the attempt

v. Recent psychiatric treatment both within and out of custody"[19] (Emphasis added)

And, in the JHS "Mental Health Screening and Evaluation" policy,

"2. The **initial mental health screening includes a structured interview with inquiries into**:

a. A history of:

i. Psychiatric hospitalization and outpatient treatment

ii. Substance use hospitalization

iii. Detoxification and outpatient treatment

iv. **Suicidal behavior**

v. Violent behavior

vi. Victimization

vii. Special education placement

viii. Cerebral trauma or seizures

ix. Sex offenses

b. **The current status of:**

i. Psychotropic medications

**ii. Suicidal ideation**"[20] (Emphasis added)

After Mr. Clinard's initial entry into the KCCF Intake, Transfer and Release area (ITR), Registered Nurse Stewart Hanney conducted Mr. Clinard's intake medical screening.[21] There are no notations by RN Hanney regarding Mr. Clinard expressing suicidal ideation at intake. According to the charted notes regarding the intake medical screening, Nurse Hanney did not identify Mr. Clinard as having any immediacy of need medical issues. According to the charted notes, Mr. Clinard's demeanor and interaction with Nurse Hanney was utterly different from the behavior Mr. Clinard demonstrated in the courtroom earlier that day.

"S-**Without medical issues** but does have some situational anxiety related to this incarceration; Complex psych issues with meds;

O: **NAD; Inmate is pleasant calm and cooperative and communicates readily;** Vital signs are stable and can be seen within this encounter;

[19] "Suicide Prevention Program," JHS p 3

[20] "Mental Health Screening and Evaluation,"

[21] See Progress Notes, Stuart Hanney, RN at 6/12/2017 2:45 PM

A: Anxiety as evidenced by statement of such; Coping altered r/t complex psych issues

P: Teaching related to Jail Health Services and how to use medical kite as needed; Active listening; **OK For GP**; Med veri ordered"[22]

Even following APHA standards, Mr. Clinard was given an initial medical screening by "an independent licensed health care provider or a nurse with training," i.e., RN Hanney. Information regarding Mr. Clinard's courtroom inferential statement conveying self-harming intent[23] was appropriately reported by the Bothell Police Department's transporting officer to the KCCF's receiving deputy.[24] The transfer of information about Mr. Clinard's possible suicidal ideation (as inferred from his courtroom statements) was documented using the the KCCF's Deferral Screening form.

"Suicidal statements made in court today per probable cause."[25]

Based on the outcome of RN Hanney's assessment of Mr. Clinard, the recommendation was general population, a routine housing placement. Per the current policy and practice of the KCCF and the jail's medical provider, King County Public Health Department Jail Health Service, the deferral screening form is provided to the medical staff located in the ITR area. The medical staff reviews this form as part of the initial booking process. Ms. Sueanne Brent well described this in her deposition:

"So starting with just the intake process. From an RN perspective, what does that consist of?

When an individual is booked in the jail, they are seen by an RN. It is our job to obtain their medical, their dental, and their psychiatric history, which can include current medications, and determine what will be the plan of care.

Okay. And so you see -- at least **a nurse sees every inmate that comes through the doors; is that correct?**

**Yes.**

Okay. And is there a form that you fill out when you conduct these assessments?

Yes."[26] (Emphasis added)

"So when an inmate comes in, and there's a potential complication -- say they're a diabetic, or there's what I would call a red flag, if they needed to be provided additional care, what would you do?

So the initial questions are asked by the officer, and if they say yes to any of those questions, then they will

---

[22] See Progress Notes, Stuart Hanney, RN at 6/12/2017 2:45 PM

[23] See Case Report Summary, Bothell Police Department, Case Number 17-00013532, Odegaard printed 05/14/2021; 1342 hours, "Clinard became verbally hostile towards Judge Gehlsen and shouted to her something similar to, "Just served his death warrant" and "Did not intend to live long enough". The statements were hostile, threatening, and **led people in the courtroom to believe that he was possibly suicidal**." (Emphasis added)

[24] There appears to be no record of who transported or who received Mr. Clinard in the ITR.

[25] Deferral Screening undated (deduced as created on 06/12/2017) and unsigned

[26] Brent 13/6-19

call for a nurse to come up. And our job is to assess whether we can provide care for them."[27]

"And assuming that they don't need a fit-for-jail done, what's done next?

They are -- you know, I'm not real familiar with what happens after that because I'm not an officer or DHJD. But what I witness is they are then dressed out and put in a uniform and then placed in a holding cell. **A deferral form is then put at the nurse's station for us to -- that lets us know that someone is ready to be seen.**

**And you said deferral form. What's that?**

**The deferral form is the form that the officers use in prebook to ask those questions, those initial questions to determine whether a nurse needs to be called up or not.**

Okay. And that's something that -- all right. So they're placed into -- they're not put into housing at that point. At that point, they're put into an area, and they await for -- they're waiting to be evaluated by you; is that correct?

Yes.

Okay. And when you -- **before you evaluate them, you would review their deferral form; is that correct?**

**Yes.**

**Okay. And that's with every inmate no matter what?**

**Yes.**

Okay. And if you saw something on the deferral form that needed attention from a mental health provider, what would you do?

I would need to assess them and hone in on their mental health and find out what it is that's going to be the plan of care for them.

Okay. **And if there was a concern about an inmate's suicide risk on the deferral form, what would you do?**

**I would address that and ask them if they are suicidal. I would ask for their history. I would ask for their -- any medications, their diagnosis, any past or recent hospitalizations, counseling.**

Would you have -- **would you get a mental health provider involved?**

**No. Well, it would depend on what -- what I obtained in the assessment.**

Okay. So you at that point, **you're conducting your own suicide risk assessment. Is that fair to say?**

**Yes.**"[28] (Emphasis added)

According to RN Brent, medical staff query new arrestees for self-harm propensities and assess the arrestee for levels of risk, ranging from no-one to acute. RN Hanney had immediate access to the Deferral Screening form ref-

---

[27] Brent 14/5-13

[28] Brent 15/2-25; 16/1-24

erencing statements made in Bothell Courtroom by Mr. Clinard. RN Hanney would have had both the Deferral Screening form information and the standard medical questions that, according to RN Brent, include questions related to self-harm. These two items would drive RN Hanney's assessment of Mr. Clinard's self-harm acuity level.

Based upon the information charted by RN Hanney, a reasonable correctional administrator would conclude that Mr. Clinard denied suicidal ideations during RN Hanney's medical assessment process. RN Hanney did not identify Mr. Clinard as having an acute need for implementing established suicide intervention protocols. On the contrary, RN Hanney recommended Mr. Clinard's placement into general population housing with no restrictions. Custody staff followed RN Hanney's recommendations and placed Mr. Clinard into a general population housing unit, Unit 4E08UA03, 3 House. The actions of the Bothell transporting officer, the KCCF intake deputy, and RN Hanney met acceptable correctional practice as expected by a reasonable correctional administrator.

The array of mental health care and suicide prevention and intervention policies are extensive and commendable. A review of the flowchart of possible avenues for arrestees to enter into mental health services[29] shows the multiple pathways into the numerous mental health service venues. These venues include specific housing and service provision based upon the acuity of mental health issues.[30] The KCCF contract medical provider's policies for identifying, assessing, preventing, and intervening in suicidal ideation exceeds acceptable correctional practice as expected by a reasonable correctional administrator.

### *C. Assessment by King County Crisis and Commitment Services*

Mr. Clinard was assessed by Mr. Benjamin Kallay on 06/15/2017 per the court referral arising from Mr. Clinard's behavioral outburst int he Bothell Municipal Courtroom on 06/12/2017.[31] Approximately 3-days after entry into the KCCF. According to Mr. Kallay's report, Mr. Clinard reported his actions in the courtroom as being spontaneous and impulsive.

> "When I explained the purpose for the evaluation, he stated that he recalled presenting as **bizarre and out of the control** while at the court room on 8/12. He stated that his wife had caused his "PTSO" to escalate In that moment and for him to appear "more manic." When asked tor clarification, he stated that he had been quite overwhelmed with his recent divorce proceedings and stating that his life had completely imploded as a result."[32] (Emphasis added)

When directly queried regarding the statements of self-harm he made in court, Mr. Clinard denied suicidal ideation, homicidal ideation, hallucinations or delusions.

> "When asked, the patient denied any SI, HI, hallucinations, or delusions. He confirmed that he suffered from "bipolar disorder" which often caused significant mood swings and sudden rages."[33]

---

[29] See Exhibit 1-Flowchart, "Psych Services/DAJD, Stream Current State, June 2012"

[30] For example, some pathways lead actively suicidal arrestees/inmates into "Red" housing where the implementation of intervention protocols is the most extensive. Other pathways lead to ""Yellow" and "Green" housing, each with targeted resources intended to address the identified needs of those assigned to that housing unit.

[31] See Intake Form dated 06/14/2017;1758 hours, King County Crisis and Commitment Services, "Referral Source" listed as "CR" (Court Referral, p. 1) and "Caller" listed as "Bothel (sic) Muni Court"

[32] Documentation of Face to Face Assessment dated 06/15/2017, King County Crisis and Commitment Services, p. 7

[33] Ibid

Mr. Kallay provided multiple entries documenting Mr. Clinard as not presenting any issues of suicide or self-harm propensity. Additionally, Mr. Kallay documented Mr. Clinard's future orientation documenting that Mr. Cinard did not present any serious threat of suicide or self-harm.

> "Pt presented as a 38•year old, well-groomed, Caucasian male of average build, who at the time of my arrival was steeping in his cot. Pt presented as calm, cooperative, polite, deferential, with linear and organized thinking. no noticeable latency, confusion, or memory impairement (sic), with speech that was clear, coherent, and within normal rate and rhythm, who did not appear to be RIS. **He presented as future oriented and in volitional control**."[34] (Emphasis added)

> "Intact as the pt presents as calm, in volitional control, **denying intent to harm himself or others**, is able to meet his basic needs, with **no known incidents where he has seriously harmed himself** or others."[35] (Emphasis added)

> "He has made vague suicidal statements In the recent past, including slating that he didn't care if he lived and telling his father "I can't go on much longer," however had **never expressed any specific threats of suicide nor voiced Intent to harm himself. It seems unlikely that he would seriously harm himself as despite his reported stressors** he **presents as relatively calm, future oriented, in volitional control**. with no noticeable latency or vegetative symptoms, and **quite convincingly denies any thoughts of harming himself**."[36] (Emphasis added)

Mr. Kallay final recommendation was that Mr. Clinard did not present a threat of suicide or self-harm and needed no further crisis intervention from King County Crisis and Commitment Services.

> "Regardless, **he does not appear to pose a risk of serious harm to himself or others**; nor to the community, so does not need to be involuntarily detained."[37] (Emphasis added)

### *D. Care Provided While in General Population Housing*

Mr. Clinard made three requests for care services: 06/18/2017, 06/19/2017, and 06/23/2017.[38] All three requests for services were responded to in a timely manner by the medical staff. None of Mr. Clinard's requests for services indicated he was having an issue with suicidal ideation. This would be consistent with the information Mr. Clinard provided the King County Crisis and Commitment qualified medical provider.

Mr. Clinard's first two kites dealt with obtaining a social worker to address future housing and employment issues after his custody release. These kites would appear to be indicators of future orientation. Future orientation is viewed as the antithesis of self-harming thought and often indicates positive mental health.[39]

---

[34] Ibid, p. 7

[35] Ibid, p. 8

[36] Ibid, p. 8

[37] Ibid, p. 8

[38] Medical Kites dated 06/18/2017; 06/19/2017; and 06/23/2017

[39] The American Psychological Association defines future orientation as, "a time perspective that is focused on the future, especially on how to achieve one's desired goals." (Accessed at https://dictionary.apa.org/future-orientation)

"I am in need of help locating or getting into direct contact w/ a mental health court liaison (sic). Thanks, M. Clinard"[40]

"I am in need of speaking to a social worker about my recent incarceration and how it may affect my current housing situation (&) ability to earn an income."[41]

Mr. Clinard's third medical request dealt with his desire to have previously denied medications instituted. There is no indication of suicidal ideation.

"Please consult w/ my psychiatrist of record, Dr. Sang Suh, at 2820 Northrup Way, Bellvue, WA to inquire as to why my interest in being prescribed "Protein" (spelling?) (8) up'ing my Lithium R/X from 600mg/day to 1200mg/day."[42]

Mr. Clinard received a reverse kite from the medical staff dated 06/24/2017 informing him that he had been scheduled to see a mental health provider. The reverse kite also explained medical staff denied his medication request because of jail policy. This kite also informed him of the steps he might take to obtain the medication from the jail provider.

"Mr. Clinard, A clinic appointment with a mental health provider has been scheduled. No changes to your medication doses will be considered until you are seen in person. I understand that while out of jail you varied your dose of lithium depending on how you were feeling, however in this setting that is not possible. If you have questions or concerns before that time, please kite for services. Thank you, Psychiatric Provider Team."[43]

A review of Mr. Clinard's Medication Administration Record for June and July 2017 shows that he received medications per the provider's authorization.[44] There is no record that Mr. Clinard expressed to medical staff, mental health staff, or custody staff any suicidal ideations during the receipt of these medications from medical staff or the accompanying custody staff. On the contrary, Mr. Clinard appears to have been satisfied with his care and housing placement. Additionally, even after his request for the medications was denied, Mr. Clinard did not file any grievances regarding his medical or mental health care challenging the decision.

According to the Triage completed by RN Brent on 06/24/2017, Mr. Clinard did not report any suicidal ideations. RN Brent reported Mr. Clinard stated he felt stable and requested he remains in his current housing.

"S: Pt reports not on correct Lithium dose - takes between 600 -1200 mgs QD Lithium: 15 ml of 8meq/5ml in the morning ( 900mgs) Lithium: 5ml of 8meq/5ml at night ( 300mgs) Also reports varies depending on mood and feeling Reports going through divorce **States "feel stable now"** but admits to anger issues **Denies SI or history of SI Request to stay on current unit "I like the people I am with"** Requesting to have psych appt Requesting to have Lithium increased Requesting reverse kite from psych regarding plan of care

---

40 Medical Kite, dated 06/18/2017

41 Medical Kite, dated 06/19/2017

42 Medical Kite, dated 06/23/2017

43 Reverse Kite dated 06/24/2017

44 Medication Administration Record (MAR) from 06/13/2017 to 06/30/2017; from 07/01/2017 to 07/03/2017

O: BP 138/86 | Pulse 85 | Resp 16 | SpO2 97 **Easy to engage - linear thought process - behavior appropriate** Well groomed male Chart review done - med verification on 6/13/17 noted pt takes 2-10ml Lithium QD Discussed 3 levels of psych housing - ranging from isolation to group setting

A:Psych medication concern

P: Kite: PRN or if s/sx get worse Push water to keep hydration Discussed reading / writing / art / exercising as techniques for coping **Pt agreed if feeling like harming self or others he will request immediate medical attention**."[45] (Emphasis added)

RN Brent triaged Mr. Clinard after his Medical Kite request for care services on 06/23/2017. By RN Brent's chart notes, Mr. Clinard's presentation was appropriate and presented no self-harm issues.

"So you discussed the three levels of psych housing, but you decided not to have Mr. Clinard entered into one of those levels of psych housing; is that correct?

Yes.

And why? Why did you make that decision?

**Because he stated that he wasn't suicidal. Because based on this written assessment, he did not present to be decompensating. So he wasn't hallucinating. He appeared to be able to take care of ADLs. He was well-groomed. He was talking and had linear thought process.**

It says here down at the bottom, patient agrees if feeling like harming self or others, he will request immediate medical attention. Why did you write that?

Because I talked to him about accessing medical 24/7 if he should feel like he's decompensating or feeling like he's going to harm other people so that we could take care of him.

**Did you have a concern about Mr. Clinard's suicide risk?**

**No**."[46] (Emphasis added)

Mr. Clinard remained in his assigned general population housing unit for another nine-days before committing suicide. During that nine-day time, he did not notify any member of the KCCF staff of his suicidal thoughts. There is no indication that any KCCF medical, mental health, or custody staff member was aware that he was contemplating suicide. It is not reasonable for medical, mental health, or custody staff to implement suicide prevention and intervention protocols without identified statements or behaviors that the individual inmate is contemplating suicide. By correlation, it appears that Mr. Clinard's telephone call to his mother was the triggering event that led to his impulsive suicidal action.

It appears evident that, based on his responses to querying, Mr. Clinard had no suicidal ideations as of 06/24/2017 12-days after the issues he presented in the Bothell Courtroom on 06/12/2017, and 9-days after he gave the same responses to the King County Crisis and Commitment assessment. The two assessments came to the same conclusion: Mr. Clinard was not harboring suicidal ideations. Between 06/24/2017 and 07/03/2017, Mr. Clinard did not present issues of suicidal ideation to either custody or medical staff. The medical and mental health care

---

[45] Progress Notes dated 06/24/2017; 1208 hours

[46] Brent 26/8-25; 27/1-6

services provided to Mr. Clinard met an acceptable level of medical care as expected by a reasonable correctional administrator.

***E. Mr. Clinard's Adult Decision to Commit Suicide***

On 07/03/2017, Mr. Clinard made five telephone calls to a number used by his mother, Marie.[47] Mr. Clinard's suicide gesture on 07/03/2017 appears to have been an impulsive act arising from the conversation, or conversations, he had with his mother on the inmate telephone system earlier on 07/03/2017. According to another inmate in the housing unit, Michael McCoy, Mr. Clinard stated to his mother, "I'm gonna kill myself.,"[48] to which she replied, "don't say that."

Neither Inmate McCoy nor Mr. Clinard's mother perceived the threat to be sufficiently severe enough to prompt them to notify the KCCF custody staff. According to Inmate McCoy, he thought Mr. Clinard was "just playing around" when he made self-harm intent statements.

"SIMMONS: Did he ever make any comments about harming himself?

MCCOY: Uh, well. .. One day he was on the phone with his mom. You know, I don't know if it was … yesterday or today. I can't recall. He said, uh ... I thought he was just bullshitting, but he said, 'I'm gonna kill myself.'

SIMMONS: **He said, 'I'm gonna kill myself.'**

**MCCOY: Yeah.**

**SIMMONS: Who did he say that to?**

**MCCOY: I think he said it to his mom. That's what I thought. I thought he was just playin' around.**

SIMMONS: Is that why you said I need to talk to his mom?

MCCOY: I-I just know that he's had a lot of problems 'cause me and him talk a lot. Talked a lot in the cell, talked about our ... different problems and stuff.

SIMMONS: Did he say how his mom reacted when he said that to her?

MCCOY: **She said, uh ... She said something to the effect that, she said, like, 'Don't say that.' Or something like that. And h-he ... I didn't hear exactly what she said, but I could tell by his response, kinda like that.**

SIMMONS: How did the conversation end?

MCCOY: Yeah. And, uh ... Wow, I'm b-, I'm just blown away, man.

SIMMONS: How did the conversation end with his mom?

MCCOY: Not too good."[49] (Emphasis added)

---

[47] The telephone number (256) 998-0257 was recorded as being called at 08:14:39 hours, 08:55:48 hours, 11:52:20 hours, 16:01:41 hours, and 17:39:12 hours. Mr. Clinard's mother's number can be deduced from the recorded conversations as (256) 998-0257. The two remaining calls appear to be account balance checks by Mr. Clinard.

[48] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-McCoy, Michael dated 07/03/2017; 2315 hours

[49] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-McCoy, Michael dated 07/03/2017; 2315 hours, p 5&6

Audio recording of the morning telephone call between Mr. Clinard and his mother documents Mr. Clinard's threats of self-harm overheard by Mr. McCoy. Interestingly, Mr. Clinard's abusive interactions with his parents spurred his mother to make her own inferential statements of self-harm, mirroring Mr. Clinard's.

> MICHAEL CLINARD: You know what? Listen, I want to tell you something. **When I die in this prison, I'm going to do it right. I'm going to kill myself in this prison. I wish you guys would, like, have listened to me, because I told you this shit over and over and over again. I'm going to laugh in hell.**
>
> **MS. CLINARD: You -- you cannot kill yourself. You got kids, so --**
>
> MICHAEL CLINARD: Bet. Bet.
>
> MS. CLINARD: You know.
>
> MICHAEL CLINARD: Huh?
>
> MS. CLINARD: **You know what --**
>
> **MICHAEL CLINARD: You wish I wouldn't, but I will.**
>
> **MS. CLINARD: I will like --**
>
> **MICHAEL CLINARD: You'll never hear from me again (inaudible).**
>
> **MS. CLINARD: I feel like doing the same thing, because you're driving us. You're making us fight. We're going to get a divorce now because of this.**
>
> **MICHAEL CLINARD: I don't give a fuck.**
>
> MS. CLINARD: So, you know --
>
> MICHAEL CLINARD: You think I give a fuck? Put him on the phone, or you'll be sorry that you didn't, all right? I'm saying that you need to do this, all right?"[50] (Emphasis added)

According to the Seattle Police Case Investigation Report, Mr. Clinard also made self-harm inferential statements on the evening of 07/03/2017 at 1743 hours.

> "The jail phone calls made by Clinard were obtained from KCJ and reviewed. On July 3rd at approximately 1743 hours Clinard called his parents in Alabama and was able to speak with his mother, Maria for just over four minutes. **While on the phone with Maria, Clinard told her, " ... tonight's the night. Independence Day, you know what I mean ... " Clinard's mother repeatedly asked him not to say that and not to give up. Clinard responded by saying," ... I'm done, I'm just done." Maria again begged Clinard not to talk like that and suggested to him that he talk to a counselor in the jail. Clinard told Maria, "Talk to you on the other side, love you." Maria continued to tell Clinard not to give up** and Clinard's final words before hanging up were, "I'm not, I'm doing what I need to do ... "[51] (Emphasis added)

Excerpts from the evening recording reflect the Seattle Police report. Further, the excerpts indicate that Mr. Clinard's mother perceived him to be threatening self-harming behavior. At multiple times in the conversation, Mr.

---

[50] Verbatim Report of Recorded Telephone Call From King County Correctional Facility July 3, 2017; 0814 hours 8/12-25; 9/1-11

[51] Case Investigation Report, Seattle Police Department, Number 2017-240752, Detective Britt Kelly, "In Custody Death - King County Correctional Facility," dated 07/03/2017, p 7

Clinard's mother implores her son not to do anything rash and talk to the KCCF mental health counselors. For example,

"MICHAEL CLINARD: I --

MS. CLINARD: -- sweet. You got -- you got a heart, Michael. You're a good man.

MICHAEL CLINARD: (Inaudible) -- fucking more, so.

MS. CLINARD: Michael, come on.

MICHAEL CLINARD: Right.

MS. CLINARD: No, it's all -- listen --

MICHAEL CLINARD: No.

MS. CLINARD: -- listen --

MICHAEL CLINARD: **No, tonight's the night. I'm — Independence Day, you know what I mean?** I was a good dad.

MS. CLINARD: I don't --

MICHAEL CLINARD: (Inaudible) -- me a moment (inaudible).

MS. CLINARD: I -- I don't celebrate that anymore. Just hang in there, baby. Please.

MICHAEL CLINARD: No. No.

MS. CLINARD: Come on, Michael.

MICHAEL CLINARD: **It's all done. Just -- I did what I needed to do and so** —"[52] (emphasis added)

Also in the conversation, Mr. Clinard appears for the second time on July 3, 2017, to give his mother his rationale for suicide.

"MS. CLINARD: Michael --

MICHAEL CLINARD: -- (inaudible).

MS. CLINARD: **-- what -- what are you doing? Just hang in there, please,** and you'll be out.

MICHAEL CLINARD: No.

MS. CLINARD: No, what?

MICHAEL CLINARD: No.

MS. CLINARD: You're going to be out, sweetie. It — please.

MICHAEL CLINARD: No. No.

MS. CLINARD: You got a life coming at you, a good one.

MICHAEL CLINARD: **I tried. I tried to get you guys to do what I asked you to do. You wouldn't do it. Dad**

[52] Verbatim Report of Recorded Telephone Call From King County Correctional Facility July 3, 2017; 1739 hours 4/4-23

**refused to do it, so now I'm --**

MS. CLINARD: Michael, it's not that. We couldn't do it, baby.

MICHAEL CLINARD: **No, it doesn't matter anymore. It doesn't matter anymore.** I don't --

MS. CLINARD: It does.

MICHAEL CLINARD: -- need anything anymore. (Inaudible).

MS. CLINARD: **Michael. Michael, don't give up.** I mean, it's --

MICHAEL CLINARD: No, I'm not. I'm done. **I'm just done. Like, I -- this isn't giving up. It's just me being practical.** Like, I've had pretty (inaudible) --

MS. CLINARD: Listen. Listen. People -- you're not the only one that it happened to. **There's people that has problems like that and they come on top. Listen to your mother.**"[53] (Emphasis added)

And, further justification by Mr. Clinard,

"MICHAEL CLINARD: **You guys don't even like me, so. Dad doesn't.**

MS. CLINARD: Michael, you -- like you? We love you. We're --

MICHAEL CLINARD: If you love me it's great, if not great, okay? So.

MS. CLINARD: Come on. **Don't give up. Hang in there, please,** Michael. I love you.

MICHAEL CLINARD: Why?

MS. CLINARD: You're gonna come -- you're gonna come out on top, trust me.

MICHAEL CLINARD: Please -- oh, yeah, okay, cool. All right, well --

MS. CLINARD: Come on.

MICHAEL CLINARD: **-- talk to me on the other side, okay?** Love you. Okay.

MS. CLINARD: That stuff about the bank, quit worrying about that, for heaven's sake. Just hang in there, sweetie. We'll work on that when you come out, okay? Your mother will help you if I have to work more --

MICHAEL CLINARD: **No, don't worry about it, okay?**

MS. CLINARD: Come on, Michael, don't -- don't act like that. **Hang in there, sweetie, please. You got children. Think about your babies.** That letter says it all."[54] (Emphasis added)

As the conversation progressed, Mr. Clinard's mother demonstrated her awareness of the jail's mental health resource availability in her attempt to get Mr. Clinard to seek assistance from the jail mental health care staff. Mr. Clinard also indicates his determination to commit suicide.

MS. CLINARD: Listen --

---

[53] Ibid 5/3-25; 6/1-7

[54] Ibid 6/18-25; 7/1-16

MICHAEL CLINARD: It doesn't --

MS. CLINARD: -- there's -- **there's counselors in there. You need to talk to them. There's counselors in jail, baby.**

MICHAEL CLINARD: **No**.

MS. CLINARD: **Okay?**

MICHAEL CLINARD: **No.**

MS. CLINARD: **Don't give up.**

MICHAEL CLINARD: **I'm not. I'm doing what I need to do, okay?** Tell Dad I said "fuck off," all right? See you later.

MS. CLINARD: Come on, Michael, don't be like that.

AUTOMATED VOICE: The caller has hung up."[55] (Emphasis added)

The telephone call on the evening of 07/03/2017 at 1739 hours would have been after Mr. Clinard's cell-mate, Michael McCoy, had been moved. Mr. McCoy had been relocated earlier in the day around 1100 hours.[56] On 07/03/2017, Mr. Clinard made two statements of self-harm intent to his mother on the inmate telephone system. Two calls earlier in the day occurred before 1100 hours, at 0814 hours and 0855 hours. The call Mr. Clinard placed at 0814 hours is the conversation his cellmate, Michael McCoy, referenced in his statement to the investigators.

Two additional calls by Mr. Clinard to his mother were recorded as occurring at 1601 hours and 1739 hours. In the second evening call at 1739 hours, Mr. Clinard reiterated his self-harm intent. Neither the morning nor evening calls' contents were reported to the jail staff, or to mental health staff as Mr. Clinard's mother implored. Without this critical information upon which to act, the ability of the KCCF staff to implement established suicide prevention and intervention protocols was severely impeded.

Inmate McCoy did not relate his understanding of the contents of the call he overheard to any correctional officer, on the day shift. Mr. McCoy could easily have told any of those officers involved in his movement from to the trustee unit about Mr. Clinard's threading behavior; he did not do this. As a result, Officer Allen who came on duty the evening of 07/03/2017, hours after Mr. McCoy had been relocated by other custody staffers not informed of Mr. Clinard's statement and intent.

Mr. Clinard's mother, Maria, was aware that mental health resources were available to her son. Yet, she, like Mr. McCoy, did not notify either the KCCF custody, medical, or mental health care staff of the self-harm intent relayed in her son's calls (at least two) to her.[57] No record exists indicating Mr. Clinard's mother made any efforts to contact the jail to express her concerns for Mr. Clinard's safety arising from the 07/03/2017 telephone calls.

The two individuals that were aware of Mr. Clinard's threats failed to notify the staff of the KCCF. Neither the KCCF nor Officer Allen was ever informed of the suicidal threats Mr. Clinard made on the telephone on 07/03/2017.

---

[55] Ibid 8/16-25; 9/1-4

[56] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-McCoy, Michael dated 07/03/2017; 2315 hours, p 2

[57] Listen to Recorded Inmate Telephone Call, Securus Inmate Telephone System dated 07/03/2017 between Mr. Clinard and his mother, who repeatedly attempts to assuage Mr. Clinard's inferential statements os self-harm.

Neither the KCCF nor Officer Myron Allen was ever aware of Mr. Clinard's suicidal intent. Neither the KCCF nor Officer Myron Allen was ever provided the opportunity to intervene and abate the risk arising from Mr. Clinard's threats.

Mr. Clinard's adult decision to commit suicide appears to have been an impulsive act, much like his behavior in the Bothell Police Department Courtroom on 06/12/2017. Approximately 3-weeks elapsed between Mr. Clinard's inferential statement of self-harm on 06/12/2017 and his suicidal act. When queried by custody and medical staff during that 3-weeks about suicidal ideation, he denied having any. What seems similar in Mr. Clinard's behavior in the courtroom and the jail is the impulsive nature of his actions. According to several inmates housed in Unit 4E08UA03, Mr. Clinard's behavior while on the telephone with his parents was immature and reckless. For example, Inmate Delaney Harris' description of Mr. Clinard's behavior:

> "**He would, like, cuss at h-his family members, so his mom and dad, and that caused the cell. .. the cellmates to ask him questions like wh-why was he doing that**. So that's how we really got to know him first. We saw his, uh, h-his anger as he was getting on the phone. Usually his, um ... He would talk about, tell his dad to do something for him and then his dad wouldn't do it and then he would start cussing and then he would hang up the phone. **Uh, it was weird to see him do that 'cause he's, like, he's over the age of 30. He ... It seemed like a kid would do that. Like a 12-year-old kid**."[58] (Emphasis added)

And from Inmate Yahya Adan,

> "Yeah, he's usually out watching TV with everybody. But it was kind of a weird, after he got off the phone and he just hung up and then went to his door, slammed his door or something, but he's usu-, we usually know that **he's always yelling on his phone or something, I guess to his dad or something** and then, and then aft-after, he gets off the phone he always looks all stressed out or something."[59] (Emphasis added)

And,

> "Did you hear any of the conversation he had?
>
> No, not really. I mean he did, he was asking his dad to search something up, but I didn't I couldn't really, that he usually does that and then his dads not probably listening to him or anything. So, he would always be yelling on the phone or something. It was weird.
>
> Was he yelling today?
>
> Sounde- it sounded like a little bit of yelling. But that… I mean he wasn't try to yell but he was kind of like, holding back on (unintelligible), this and that.
>
> Okay. Um, so you saw him, what was probably the last time that you saw him? Do you have any idea what time it probably was? 5, 5-ish, 5 ... 5:20. That's when he made the phone call?
>
> Yeah, because he doesn't really take long to clean, probably takes like 10 or 15 minutes just to clean there, you know and we have this small area so it doesn't really take that long. But me and uh, like I said, me and the, one of the dudes, the 4-house dude, we was trying to ask him if we could help clean but then the CO

[58] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Harris, Delaney dated 07/03/2017; 2148 hours, p 2

[59] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Adan, Yahya dated 07/03/2017; 2245 hours, p 5

wasn't letting us and stuff."[60]

Knowledge of Mr. Clinard's suicidal ideation was not widely known in the housing unit. With the exception of Mr. Clinard's former cellmate, Michael McCoy, other inmates in the housing reported that they were unaware of Mr. Clinard's suicidal ideations, though they were aware of his less than positive interactions with his mother. From the interview with Inmate Thomas White:

> "Did he make any comments about being depressed?
>
> No.
>
> OK. O-**or any comments about being suicidal or. ..**
>
> **No**."[61] (emphasis added)

And from Inmate David Anderson's interview:

> "Um ... No, huh-uh. No, I mean, **as far as did he say that he's ever gonna hurt himself? No, none of that**, you know? Um, he just. .. He was just, you know, upset, and uh, he has visitation stuff with his kids and ... you know, so on and so forth. Everything with his wife. He's just down in the dumps, you know."[62] (Emphasis added)

And from Inmate Michael McCoy's interview:

> "SIMMONS: **How did the conversation end with his mom?**
>
> **MCCOY: Not too good.**
>
> **SIMMONS: Can you explain that for me?**
>
> **MCCOY: Cause ... na ... 'Cause every time he talked to his mom or his dad, his dad, you know, he was ... swearing up a storm at her. I couldn't talk to my mom like that. I'd get. .. She'd slap the shit out of me.**
>
> SIMMONS: Is that what happened today?
>
> MCCOY: Yeah, he's always ... **He was kinda frustrated with his parents, t-to say the least.** Somethin' to do with, somethin' to do with his, uh ... Somethin' to do with h-his balance, somethin' to do with his bank accounts going into the negative."[63] (Emphasis added)

As stated previously, there were only two persons aware that Mr. Clinard was contemplating suicide: Michael McCoy and Mr. Clinard's mother, Maria. Had either Mr. McCoy or Mr. Clinard's mother, Maria, notified KCCF custody, medical or mental health care staff of Mr. Clinard's suicidal threats, they would have had the opportunity to assess and intervene if necessary. Yet, neither Mr. McCoy nor Mr. Clinard's mother, Maria, notified KCCF custody, medical or mental health care staff of Mr. Clinard's suicidal threats.

### *E. Officer Allen's Response to Mr. Clinard's Suicide*

[60] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Adan, Yahya dated 07/03/2017; 2245 hours, p 6

[61] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-White, Thomas J dated 07/03/2017; 2146 hours, p 4

[62] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Anderson, David dated 04/03/2017; 2230 hours, p 4

[63] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-McCoy, Michael dated 07/03/2017; 2315 hours, p 6

When Mr. Clinard committed suicide, Officer Allen was appropriately conducting his assigned duties surrounding the management of the other approximately 93 inmates under his care on 07/03/2017. Mr. Clinard was in general population (GP) housing with no mental health need alerts indicating a need for increased levels of observation. As such, Mr. Clinard's status in GP would not put Officer Allen on alert of the need to watch Mr. Clinard's behavior. Mr. Clinard's otherwise appropriate behavior following the evening meal would also not have alerted Officer Allen of a need to increase Mr. Clinard's observation level. There is no indication that Officer Allen was aware of Mr.-Clinard's conversation with his mother, which occurred after completing the pod area cleaning. It appears clear that Officer Allen was utterly unaware that Mr. Clinard was contemplating self-harm. According to Officer Allen's interview, Mr. Clinard did not stand out from the other 93 inmates under his care.

> "Like I said, **I had no ... prior knowledge to this guy's behavior or background. I had n-no reason to ... watch him,** particularly, 'cause obviously, if somebody comes to and says, 'I'm suicidal.' Whether it's real or not, he wants attention. He wants to be ... moved or. .. he actually ... actually needs help. So obviously when he's taken down to the 7th floor, you have somebody that's supposed to watch him every, you know, check him every 15 minutes. That wasn't the situation on my floor. **So like I said, there was no reason to, uh, give this guy any extra ... uh ... treat-, uh, special treatment of any kind, 'cause like I said, I h-, I had, I had, I didn't know his history. I didn't know about him and he didn't act weird, you know. You know, he didn't stand out**."[64] (Emphasis added)

Adding to the perception of normalcy in Mr. Clinard's behavior, he was assigned to be the unit "cleaner," an individual picked from the housing unit inmates to clean up the pod area after the evening meal. This cleaning task typically would involve both inmates assigned to a specific cell. The intent of this practice is to spread the duties of housing unit sanitation around amongst the various inmates living there. But Mr. Clinard's cellmate had been relocated earlier in the day (07/03/2017) to a trustee housing unit,[65] leaving the task to Mr. Clinard.

Mr. Clinard was housed singly in a double bunk cell only because he had a conflict with a newly assigned cellmate. In the early afternoon of 07/03/2017, a new inmate was placed into the housing unit and assigned to share Mr. Clinard's cell. The second inmate was transferred out after the conflict with Mr. Clinard.

> "Mm ... I don't think so, um ... Well, there's the once cellmate that came in today but he was there and then he left.
>
> SIMMONS: And what happened with him?
>
> OGDON: **He didn't wanna be in there. Um, he said he needed to be alone and so he went into the cell. He was there for like an hour and then they transferred him.**
>
> **SIMMONS: Was there any altercation between them?**
>
> **OGDON: A little bit, yeah, through the door**.
>
> SIMMONS: What happened?
>
> OGDON: Well, the black guy seemed paranoid and, uh, Mike, I-I call him the black guy 'cause I don't know his

---

[64] Officer Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Allen, Myron dated 08/14/2017; 1450 hours, p 5

[65] See Case Investigation Report, Seattle Police Department, Number 2017-240752, Detective Britt Kelly, "In Custody Death - King County Correctional Facility," dated 07/03/2017, p 6

name, uh, Mike was just. .. didn't want any problems, you know. Like, I don't know.

SIMMONS: **And around what time did they move him out?**

**OGDON: Uh ... I'd have to say like 1:15.**

**SIMMONS: OK.**

**OGDON: 1:10, something like that.**

**SIMMONS: And that was before you saw him ... doing trays later on?**

**OGDON: Uh, yes.**

SIMMONS: OK. Was there anyone else in his cell before?

OGDON: Yes, there was a guy that moved to trustee. They seemed fine.

SIMMONS: No issues?

OGDON: No issues. And then the guy before that was fine."[66] (Emphasis added)

Officer Allen appropriately conducted hourly welfare observations on the 94-inmates assigned to his care on the evening of 07/03/2017. For general population inmates, the conduct of welfare observation typically ranges from 30-minutes to 60-minutes, dependent upon agency policy and procedures and any applicable state jail standards.

"And I think I recall, when talked the night of this incident, um, that **you had mentioned that you did one of those cell checks** ...

ALLEN: Mm hmm.

KELLY: As you just described, to, um, Clinard's cell, um, sometime around dinnertime o-or. ..

ALLEN: Well, it was before that.

KELLY: Before ... Before dinnertime?

ALLEN: Yeah.

KELLY: Um, did you see anything when you went in there?

ALLEN: Well, let's put it this way. If their beds are neat, if there's nothin' (unintelligible), out of place, I'll just peek in and keep going.

KELLY: Sure.

ALLEN: **I didn't see anything. So like I said, h-he was ... Like I said, nothin' out of the ordinary. Everything was in place. I peek in, I only stop and look further when I see something out of place.**

KELLY: Of course.

ALLEN: So ...

KELLY: OK. **What time do you think was your. .. last check on ... on him?**

[66] Inmate Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Ogdon, Cody dated 07/03/2017; 2245 hours, p 7

**ALLEN: Hmm. It had to be, I-I. .. I'd have to look uh what I wrote down, but it had to be around ... I wanna say 5:30. Because m-my next check would've been around 6:30, right about when this happened.**

KELLY: Sure.

ALLEN: So ... But. .. I wan-, like I said, I can't, I-I don't r-, you know, 'cause everything ... is not on the hour.

KELLY: Mm hmm.

ALLEN: **And in fact, they prefer you not be right on the hour every hour. Switch it up a little bit. Be a little little earlier, to kinda throw 'em off, catch 'em, you know, catch 'em off guard.**

KELLY: Sure.

ALLEN: I don't know, but. .. I couldn't tell you exactly, but it w-, it w-, it was at least an hour before.

KELLY: What time is dinner usually served?

ALLEN: on-(unintelligible) I wanna say ar-, between 4:30 ... I wanna say between 4:30 and 4:45 usually."[67] (Emphasis added)

The purpose of the welfare observation is to ensure the well-being of the inmates under observation. From a reasonable correctional officer's perspective, they observe for "obvious signs or symptoms of distress," (signs or symptoms a layperson would perceive as needing medical care) and security-related issues: i.e., fighting, behavioral disruption, rule violations, etc. In the case of suicidal inmates, it is observing for self-harming behaviors-cutting, hanging, drowning, headbanging, choking-related to suicidal gestures.

On a typical observation round by custody staff, welfare observations by deputies take only a sufficient time viewing each inmate or group of inmates out in the pod recreation areas to identify "obvious signs and symptoms of distress" or other institutional issues. Officer Allen did not identify any problems when he looked into Mr. Clinard's unit while Mr. Clinard was out of his cell cleaning after the dinner meal.

"ALLEN: Personally. You know, I-I, that. .. that's the first time I, somebody's said that. I-I, honestly, I don't remember if he was out by himself. But since you did bring that up ... What ob-, what happens sometimes is if somebody's in the room by themselves, they'll say, 'Oh, can I have another person help me.' I say, 'No.' You know, 'You do it by yourself or I'll get somebody else to do it.' So he never asked. Now, for example, if that was his day to clean and if he came to the door and said, 'Allen, can I have 4 House help me?' I would've probably said no. That doesn't s-, (unintelligible), that doesn't sound right because if he was ... if he was out. .. and cleaning, he would've been out, see ... Like I said, we serve about 4 ... between 4:40 ... 4:45 and 5:00. **If he was cleaning, that mean, that means he would've been out. .. for at least an hour by himself. I mean, out where I could see him.** And then if he was gonna do what he was gonna do, he would've ... cleaned, went back in his room. That. .. That doesn't sound right. I mean, I, like I said, I am not sure. I honestly don't remember that. Th-that's, 1-1 hon-honestly I do not remember that.

KELLY: I mean, obviously I wasn't there. I'm just going based upon the other. .. um ...

ALLEN: That's, you know, I, uh, I, like I said ...

---

[67] Officer Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Allen, Myron dated 08/14/2017; 1450 hours, p 9 & 10

KELLY: I-it's ...

ALLEN: I don't know. I, honestly, I don't remember.

KELLY: Sure.

ALLEN: I don't th-, I didn't think it was him. Because of what happened, I didn't think he would c-, 'cause (unintelligible) what happens is, the reason people like to clean is you get like an hour and a half. ..

KELLY: Mm hmm.

ALLEN: Without anybody else out there. So you can come out and clean. **If you get your cleaning done, you've got like an hour and a half to shower, hit the phones, or just relax without everybody else out. So it's kind of, it's like a perk**.

KELLY: Mm hmm.

ALLEN: And ... I really don't remember him out, hangin' out, doin', 'cause ... **Obviously you have to be out and do the job and the job was done. Th-the trays were picked up and the tank was cleaned. And the trustees, I opened and ... Somebody was out. I honestly don't remember if it was him. But somebody was out at that time. So th-that pushes the time back even later. 'Cause I, like I said, I don't let 'em out until 6:30 and that's how long they would've been out.** You know, but, he, like I said, he could've racked back early. Sometimes if you're tired, you can go lay down. I didn't notice that. I. .. I honestly didn't n-, I didn't, I didn't recall him out by himself. I don't remember. But he, like I said, he didn't draw attention to himself.

KELLY: Mm hmm.

ALLEN: But like I said, he c-, s-, th-the cleaning got done, so somebody did it.

KELLY: Mm hmm.

ALLEN: And I-I s-, I assumed, I guess in my mind, I assumed it wasn't him because of what happened. 'Cause if you were gonna do something like that, you probably would've never came out of your room."[68] (Emphasis added)

Managing the needs and issues associated with the custody of approximately 96 adult inmates can be a daunting task. One universal regarding the management of inmates is that they are a "needy" group. This "neediness" only stands to reason as much of the inmates' ability to control their environment, circumstances, and personal issues is out of their control, residing with the custody staff. Simple things like watching the TV or requesting clean clothing require talking to the supervising custody staff. Multiply these needs by 96-inmates, and one can discern why Officer Allen was engaged in tasks ("stupid things") with inmates in other housing units under his supervision.

> "I was a little late racking people out that day '**cause I had a bunch of stupid things going on at one time. I had one guy that was claiming he was being bullied and/or threatened. So I pulled him out to talk to him, to see what the issue was,** if I had to move him or whatever. And at that same time, **I had another guy yellin' at me that the TVs weren't on. You know, so stupid stuff like that happens.**"[69] (Emphasis added)

[68] Officer Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Allen, Myron dated 08/14/2017; 1450 hours, p 12, 13, & 14

[69] Officer Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Allen, Myron dated 08/14/2017; 1450 hours, p 3

Managing multiple varied interests and issues confronted Officer Allen. Officer Allen had to prioritize his responses based upon his experience with the population he is managing. It is essential to bear in mind that the population Officer Allen was assigned to work did not have identified special needs. General population inmates do not require increased diligence in observations, as might be necessitated when dealing with acute medical, mental health, protective custody, and suicidal inmates. The responses of Officer Allen reflect those responses that a reasonable correctional officer would provide under similar circumstances and awareness.

> "**So he's yelling for me to tum the TV on. So I got two people yellin' at me and then at about that time, Upper A, they were yelling**, 'Hey, we have somebody that's down or hurt or something.' And I said, 'OK. Let me, I'll get to you in a minute.' **I was tryin' to get these guys under control and then he came back to the door again, 'Allen, this is really, this is serious, we think.' So then I had to get this guy back up in the tank. I had to get this guy to be quiet, get back in.** And then I had to have Upper A all rack back, 'cause I can't go up there with guys running around in the tank. I have to get everybody in their rooms and all the doors closed. **It took 'em a minute to do that because they were all middling around because they were all curious what's going on.** 'Cause when the doors open, if there's nobody physically to close it, it's, it remains open, you know. **And so I had to go up there and look and see. I had to physically go up and see what the situation was before I could call for help or know wh-what to call**, you know? I didn't know at that time. 'Cause you know, most of the time when people call somebody fell, somebody's sick, you know, something like that. This was the first time somethin' this serious has ever happened on my watch, you know, so ... **It wasn't something I was expecting**."[70]

Officer Allen's decision to delay entry into the 4E08UA housing unit until after securing all inmates in the unit in their cells is an appropriate correctional practice intended to minimize the possibility of the emergency being contrived and designed to get him into the unit for nefarious purposes. Many jails and prisons have specific policies prohibiting a single officer from entering an occupied housing unit until additional custody staff is immediately present to support the entry. Requiring multiple staff to be present is intended to protect institutional safety (in situations of riot, hostage, inmate disturbance), and ultimately, public safety (in cases of escape into the community).

Officer Allen can be equally lauded and disciplined for his rapid entry into the unit without securing all the cell doors. On the one hand, Officer Allen, in his haste and concern for the welfare of an unknown inmate, rushed in to assist. On the other hand, Officer Allen violated the KCCF policy on housing unit entry under emergency circumstances.

> "SIMMONS: One question I have. Um, so at this time, when you go into the tank, are the other cells open are all they all back in their cells?
>
> ALLEN: No, they were all back in their cells.
>
> SIMMONS: They're all back in their cells.
>
> ALLEN: Where they're supposed to be.
>
> SIMMONS: OK.
>
> ALLEN: I mean, **obviously I was in a hurry so I didn't check the doors.**
>
> **SIMMONS: OK.**

---

[70] Officer Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Allen, Myron dated 08/14/2017; 1450 hours, p 3

ALLEN: I assumed they were closed. On our panel, you know, we have a panel that shows all the doors. If the lights are green, that means they're safe or c-closed. If they're red, that means they're open. So I can set, I can sit there and see which doors are open or closed just from my station. But I just told everybody to close your doors, so when I physically saw everybody in, I went up there. I, you know, so I couldn't. .. tell if they were, 1-1 didn't care, really, at that point. I wanted to see what was goin' on. But I had tog-, I couldn't tell if they were actually fully closed.

SIMMONS: OK.

ALLEN: But they were supposed to be. They looked closed when I went up there. N-n-n-no inmates were out at the time.

SIMMONS: OK. **So y-you weren't confident that it was completely secure at that time.**

**ALLEN: No.**

SIMMONS: OK.

ALLEN: I mean, I wasn't thinkin' about that.

SIMMONS: Right.

ALLEN: Th-that wasn't m-m-my priority. Now I've had issues before where people have not closed the door fully and jumped out and (unintelligible) were doing somethin' stupid. A-and in the coup-, in the couple times that that's happened to me they weren't tryin' to assault me. They were tryin' to be funny and I told 'em, 'Man, I almost hit you as hard as I could. Don't do that stuff anymore.' You know, (unintelligible) you got people that try to be funny.

SIMMONS: Mm hmm.

ALLEN: So, you know, half the time you don't know if people a-are joking or not, you know, so I had to, I had to ascertain, is this real or not? Is he screwin' with me or what, you know?

SIMMONS: So while you're dealing ...

ALLEN: But it seemed like it was, they were real, so ...

SIMMONS: So while you're dealing with Mr. Clinard, you still have to be aware of all the other things around you, correct?

ALLEN: Oh, yeah. I mean, obviously, it was just like I said, **you could have somebody that's out to get you, out to jump you, out to hurt you, they could close their door and when you're not lookin' or not ready, they can jump on you. I mean, they, 'cause you kn-, they know your attention's somewhere else.** And obviously you people, I mean, I don't mean, I didn't mean that, 'you people.' I didn't mean it that way. But I'm just saying, you guys know, this could've been an assault. I don't know. I don't know how the guy got hurt. So I don't know if somebody attacked him. And see, that's why I always stress these guys get their closed. Because like I said earlier, I don't have many fights on my wings. I usually have pretty good control of my wings, but I've only had two fights that were really bad and they were because people jumped into somebody's room behind the door and I couldn't call it. I c-, 'cause I couldn't see what was going on. So that's why I stress to these guys, 'Get your doors closed. The longer the door stays open, the longer somebody can in your room, steal your stuff, or jump you. Come through

the door, shut it behind you.' I have, you know, like I said, o-on that floor, we can only open the door. They have to physically close it, so that's kinda (unintelligible) out of my hands, so ... Usually, though, when I do my security checks, I will physically check the door with my hand and make sure it's fully closed. 'Cause we've had some doors that were malfunctioning or. .. giving you a false positive it w-, it was actually closed and it wasn't or, you know, the other way around.

KELLY: Mm hmm.

ALLEN: So ...

SIMMONS: **So just to clarify, so from the time you ... ran to Mr. Clinard and assessed his situation to the time you radioed for help, you were by yourself, correct?**

**ALLEN: Yeah.**

KELLY:Did you, or do you remember verifying and making sure everybody was racked back before ...

ALLEN: No, like I said ...

KELLY: (unintelligible)

ALLEN: This seemed, I mean, th-they made it seem like it was ...

ALLEN: A bad situation.

KELLY: Mm hmm.

ALLEN: So 1-1 honestly, **I didn't physically look to see if all the doors were clear**. I saw them back and I went up there. As soon as I s-saw the last door close, I went right up.

KELLY: OK. **So as you said, obviously ... you went to go attend to the inmate ...**

**ALLEN: Mm hmm.**

**KELLY: Really kind of at your own risk.**

**ALLEN: Yeah**."[71] (Emphasis added)

Aside from Officer Allen's potential breach of KCCF policy on housing unit entry, his actions were an acceptable correctional response to an unidentified emergency in Mr. Clinard's housing unit. It is a reasonable correctional practice for officers to await assistance before entering a housing unit, whether for routine or emergency reasons. Depending on physical plant design, staffing levels, security detention requirements, and the perceived atmosphere within the unit, a reasonable correctional response to an emergency may take several minutes.

Officer Allen entered the unit with only a vague idea of what the emergency entailed. As a reasonable correctional administrator, I see Officer Allen's response to the emergency to be timely and appropriate given the circumstances presented to him by the other inmates in housing unit 4E08UA. As a reasonable correctional administrator, I see Officer Allen's response to the emergency to be timely and appropriate given the circumstances presented to him by the other inmates in housing unit 4E08UA.

### *F. KCCF Suicide Prevention and Intervention Training of Officer Allen*

[71] Officer Interviews-Audio Recording and Transcribed, Case Number 2017-240752-Allen, Myron dated 08/14/2017; 1450 hours, p 17, 18, 19 & 20

There is little doubt that, from a reasonable correctional administrator's perspective, Officer Myron Allen was well trained and well versed in suicide prevention and intervention. A review of Officer Allen's training records shows he has received specific training addressing suicide. Starting with his employment in 2009 and continuing every year up to the present, Officer Allen has received both online and in-person suicide prevention training.[72] Additional training focused on inmate mental illness augmented Officer Allen's training in suicide prevention.[73]

The Powerpoint presentation[74] is an excellent training tool for informing KCCF staff and Officer Allen of inmate suicide issues and the need for intervention when identified. It appears from the testimony of Mr. Paul Gulick that he, or another member of the JHS staff, has employed this same Powerpoint presentation for several years in the training of staff. According to Mr. Gulick, he referenced Mr. Clinard's suicide when he used this same presentation to train staff in the years following Mr. cleared suicide.

> "Well, let's bring up what's been marked as Exhibit D. I think this is what you were referencing. This is the PowerPoint presentation with your notes on it?
>
> Um-hum.
>
> Where do you refer -- or where do you have notes pertaining to Mr. Clinard?
>
> If I may, I'd like to refer to my hard copy.
>
> Yes, absolutely.
>
> It's a little easier for me. On page 3, that page. Actually, what you see here below the second slide, where those -- there is some redactions there, you know, black marker. That's where I put a few notes about people who have died by suicide in the jail. So you can see I have their age and the number of days there. So that's where I had that information.
>
> And which one of these is Mr. Clinard?
>
> He is actually -- underneath, so there's two post-it notes. You can't tell that from that record, but there's two post-it notes, and his name and his data points are underneath what you see there in my original record."[75]
>
> And,
>
> "You know, all of those -- all of those handwritten notes and post-it notes that I included in that were just -- you know, this PowerPoint was not created by me. It was a train — it was training materials produced for the PESs to use in their suicide prevention trainings. I just printed it out and included some of my own information about suicide and suicide risk so that I could refer to it during the training.
>
> **Did you conduct the training?**
>
> **Yeah. Yes.**

---

[72] See Training Records-Allen, Myron printed: KC\njudson @ 03/09/2021; 1345 hours, "**Suicide** Prevention Online Training - Adult Division WEB Based On-Line," and "**Suicide** Prevention/CIT Instructor Led Training"

[73] See Training Records-Allen, Myron printed: KC\njudson @ 03/09/2021; 1345 hours, "Inmate Mental Illness Online Training - Adult Division WEB Based On-Line"

[74] See Exhibit D-"Suicide Prevention Training," Powerpoint.pdf revised 12/14/2011

[75] Gulick 18/2-25

Okay. And when did you -- so that would have been -- let me ask you, when did you conduct the training that included these notes?

Well, I -- you know, the chart -- the chart entry I had in his record was -- sorry. Was it June of 2018? So it was probably at that time that I made a little note in these materials about Mr. Clinard. And so any training that I did after that would have -- might have -- I might have made reference to him or at least the data associated with him."[76]

A reasonable correctional administrator can conclude that Officer Allen was not the only custody staff member trained using this presentation. Providing the KCCF staff suicide awareness training with materials such as this Powerpoint is an acceptable correctional practice. Officer Allen's training record shows that he received an acceptable level of training in suicide and mental health-related issues.

[76] Gulick 19/20-25; 20/1-15

## XII. REPORT CONCLUSION

The care provided to Mr. Michael Travis Clinard by the custody and medical and mental health care staff while in the King County Correctional Facility between June 12, 2017, and July 3, 2017, was an acceptable correctional level of care as expected by a reasonable correctional administrator. Medical and mental health practitioners were directly involved in the decision-making processes regarding Mr. Clinard's medical and mental health care. Mr. Clinard denied suicidal ideation when queried by both jail medical staff and mental health staff from King County Crisis and Commitment. On July 3, 2017, Mr. Clinard gave no indication to Officer Myron Allen, or any other KCCF correctional, medical or mental health care staff that he was contemplating suicide. Those individuals who were aware of Mr. Clinard's suicidal intent did not take any steps to inform the KCCF of his intentions. Officer Allen is a trained officer knowledgeable about inmate suicide who, had he been aware of Mr. Clinard's intentions, would have been able to implement intervention processes. The actions of Mr. Clinard, and those who were aware of his suicidal intent, thus hindered the King County Correctional Facility staff's ability to implement well-established suicide intervention and prevention protocols.

I reserve the right to supplement or alter my opinion should additional information be received.

Donald L. Leach II

August 03, 2021

# Donald L. Leach II

2130 East Wasatch Boulevard, Sandy, Utah 84092
donald.leach@me.com
(859) 552-4286


## Summary of Qualifications

Experience for over 30 years in local detention (jails)/corrections.

Experience for over 20 years consulting on jail management issues nationally focusing on risk management for jails and jail operational methodology.

Experience for over 8 years as an Expert Witness in both Federal and State courts.

Supervisory experience of up to 402 employees (indirectly); supervised internal affairs investigations, experienced in interviewing, hiring, training, scheduling, motivating, evaluating, and dismissing personnel.

Experienced in administering and managing a large detention facility, developing and administering programs, budgeting, contract development and monitoring, conducting research, monitoring compliance with policies and procedures, community relations, public speaking, controlling costs, problem-solving, and preparing reports.

Extensive public relations experience as Public Information Officer for the Division developing press releases and conducting print and broadcast interviews.

Excellent oral and written communication skills in relating with people from a broad range of backgrounds.

Extensive computer experience, including planning, developing, maintaining, and installing networks.

## Employment History

***Consultant*** – 1993 to Present *Donald L. Leach & Associates, Ltd.*

Sandy, Utah

Responsible for providing a range of consultative and expert witness services involving overall jail management; including, but not limited to, such areas use of force relating to issues of security and operations, the provisions of medical and mental health services, classification, contract management for privatized services (food, medical, mental health), management information systems, strip search, gang and security threat group management in jails. Co-created and developed a new jail management paradigm – Mission Based Management. Activities include conducting training seminars in developing and implementing jail classification systems, risk management methodologies; conducting on-site visits to client facilities to evaluate jail management systems and classification systems, conduct risk management analysis; analyzing data and information systems; and developing and enhancing jail classification programs. Clients have included the Department of Justice; Ministry of Justice, The Netherlands; National Institute of Corrections; American Jail Association; Voorhis-Robertson Justice Services; and Sabbatine and Associates, LLC., among others.

***Administrative Officer, Senior (Deputy Director)*** – 1996 to 2008 *Lexington-Fayette Urban County Division of Community Corrections*

Lexington, Kentucky

Responsible for providing the Director of Community Corrections with expert advice and a full range of staff, analytical, planning, and support services related to the management and operation of the Division of Community Corrections, which provides care and custody services to over 1000 adult and 60 juvenile offenders within a modern detention framework. Serve as Director in his absence. Responsible for assisting

Director in analyzing and resolving Divisional administrative and management problems; supervising internal affairs investigations; contract development and management of privatized services (medical,mental health, food services, commissary, technology and energy); supervising subordinates; handling administrative and management duties regarding the planning, organizing, implementing, and supervising of projects and special events; administering and implementing community development programs; attending staff meetings; preparing oral and written reports; conducting research and special studies; composing newsletter articles and promotional materials; developing and formulating policies and procedures; and serving as a liaison between the Division of Community Corrections, the public, and other governmental organizations. Served as a primary member of management team responsible for the construction of a new $62 million jail facility which including spearheading the new facility transition team. Conceived, designed, implemented and managed of a $2.5 million voice, video, and data network to support the new facility.

***Planning / Research Analyst*** – 1992 to 1996 *Lexington-Fayette Urban County Division of Detention*
Lexington, Kentucky
Responsible for providing the Director of Community Corrections with expert advice, as well as a full range of staff, analytical, planning, and support services related to the management and operation of the Division of Community Corrections; developing, implementing, maintaining, supervising, and serving as system administrator for the WAN / LAN automated inmate management information system, including hardware and software; developing and enhancing the Urban County Criminal Justice Network; performing research and analysis of public policy issues for use by members of the Urban County Council; analyzing existing programs and operations and summarizing findings with recommendations; serving on various committees; overseeing various projects; attending meetings in lieu of Council members; administering the Residential Parking Permit District Program; designing and implementing special programs; and operating and maintaining databases.

***Training Coordinator*** – 1985 to 1992 *Lexington-Fayette Urban County Detention Center*
Lexington, Kentucky
Responsible for developing, implementing, coordinating, and supervising the Division of Community Correction's Training Division; supervising all training-related activities; developing curriculum and conducting pre-and in-service training for all staff members; performing needs assessments; analyzing job tasks for all areas of the organization; and recommending, drafting, and editing all policies and procedures. Advanced through ranks of Corporal, Sergeant and Lieutenant.

***Detention Officer*** – 1984 to 1985 *Lexington-Fayette Urban County Detention Center*
Lexington, Kentucky
Responsible for the care custody and supervision of an offender population within an assigned area.

***United States Marine Corps –*** 1972 to 1974 Corporal - Honorable Discharge

## Education

***Doctorate in Public Administration,*** 2005, Kennedy-Western University (Non-accredited), Cheyenne, Wyoming
***Master of Arts (I)*** coursework degree in Geography, 1979 to 1980, University Of Kentucky, Lexington, Kentucky
***Bachelor of General Studies***, 1978, University of Kentucky, Lexington, Kentucky; Area of study in Sociology, Psychology and Political Science

## Publications

"The Use of Force Continuum: Is it Worth Keeping?" (Part 2) Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, May/June 2011

"The Use of Force Continuum: Is it Worth Keeping?" (Part 1) Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, December/January 2011

"Arrestee Strip Searches: An Administrator's View," Correctional Law Reporter, July/August 2010

"How should agencies manage transgender offenders? An interview with Jail Risk Management Consultant Donald L. Leach," Leach, Donald and Whyte, Luke; Corrections One, www.correctionsone.com/correctional-healthcare/articles/2082675-How-should-agencies-manage-transgender-offenders/

"PREA Redux: What's It Going to Cost?" American Jail, July/August 2010

"PREA Redux: What's It Going to Cost?" Correctional Law Reporter, December/January 2010

"Prison Rape Elimination Act Lives On," Correctional Managers Report, December/January 2009

"Carrots versus Sticks: Managing Behavior in the Jail," American Jails, Hagerstown: November/December 2008

"PREA Draft Standards are PREA 'DAFT" Standards," Correctional Managers Report, August 2008

"Carrots versus Sticks: Managing Behavior in the Jail," Correctional Managers Report, April/May 2008

"Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails," American Jails, Hagerstown: November/December 2007; LJN Exchange, National Institute of Corrections, US Department of Justice, 2006; and Corrections Professional, November 2007

"Excited Delirium: Fact or Fiction," LJN Exchange, National Institute of Corrections, US Department of Justice, 2007

"Are Tasers in Jails a Great New Tool or Another Headache," LJN Exchange, National Institute of Corrections, US Department of Justice, 2006

"Mission Creep and the Role of the Jail in Public Health Policy," LJN Exchange, National Institute of Corrections, US Department of Justice, 2004

Creating a New Jail Management Paradigm, 2004 Published Dissertation

"Journey into Objective Jail Classification," Leach, Don and Sabbatine, Ray, American Jails, Hagerstown: Jan 1999

"A New Strip Search Paradigm," Leach, Don and Sabbatine, Ray, American Jails, Hagerstown: November/December 1996

## Professional Affiliations

*American Correctional Association (ACA)* – Member
*American Jail Association (AJA)* – Member, Board of Directors, 2006 – 2010
*Americans for Effective Law Enforcement (AELE)* – Member, Board of Directors, Faculty Instructor, Editorial Board member; Academic Committee Member, Course Director "Jail and Prison Legal Issues"
*International Association of Chiefs of Police (IACP)* - Member, Legal Officers Section
*Institute for the Prevention of In-Custody Deaths (IPICD)* – Member, Board of Directors

## Training & Certifications

***American Jail Association Training Seminar Instructor***

*Developing Religious Programs in Jails*
*Growing and Special Populations*
*Leadership and Ethics in Jails*
*Managing Security Threat Groups and Gangs*

*Managing Special Populations*
*Managing the Generations in our Jails*
*Objective Jail Classification*
*Sexuality in the Jail:Managing Lesbian, Gay, Bisexual, Transgender and Intersex Inmates*

***Certified Class D Coach,*** United States Judo Association, Incorporated
***Certified Correctional Trainer***, National Academy of Corrections
***Certified Firearms Instructor***, Federal Bureau of Investigation
***Certified Law Enforcement Instructor,*** Commission on Law Enforcement Standards and Training, Arkansas
***Certified Self-Defense Instructor***, National Academy of Corrections
***Emergency Medical Technician-Basic****,* Lexington-Fayette Urban County Division of Fire and Emergency Services
***WRAP Restraint System -*** Instructor Certification
***Media Relations for Law Enforcement***, Chris Ryan Seminars
***National Institute of Corrections Training Seminars***

*Assessing Tomorrow's Leadership*
*Developing Objective Jail Classification Systems – Instructor*
*Enhancing Human Resource Systems*
*Inmate Behavior Management – Instructor*
*Jail Design and Review*
*Managing the Medium-size Jail – Instructor*
*Managing the Small Jail – Instructor*
*Organizational Diagnosis and Change*
*Systematic Methods for Effective Decision Making*
*Training Development and Design*

***Public Safety Disability Specialist,*** Institute for the Prevention of In-Custody Deaths
***Recognition, Prevention, and Management of Excited Delirium and Sudden In-custody Deaths Instructor***, Institute for the Prevention of In-Custody Deaths
***Sensei (Instructor) 4 Seasons MMA/Kukuchi-do Judo Team,*** Third Degree Black Belt (Sandan), Judo
***Use of Force by the Numbers-Train-the-Trainer,*** Institute for the Prevention of In-custody Deaths
***Video Examinations for the Use of Force Investigator Course,*** Forensic Video Solution

## <u>CASE HISTORY - RULE 26 A) 2) B) V) DISCLOSURE</u>

**Donald L. Leach II**

Cases in which I have testified in court or deposition in the past four years per Rule 26 a) 2) B) v):

1. *S.L.C., S.E.R., S.A.L.M. v. Polk County Sheriff's Department and Darryl Christensen*, U. S. District Court, Western District of Wisconsin,. 3:16-CV-00630-WMC, 3:16-CV-00631-WMC and 3:16-CV-00632-WMC (04/2021) ***Defense***
2. *Carol Herriges v. County of Macomb, et.al.,* U. S. District Court, Eastern District,. 19-cv-12193 (11/2020) ***Plaintiff***
3. *Pia Sacchetta v. Lake County Sheriff, Peyton C. Grinnell, et.al.,* Circuit Court of the Fifth Judicial Circuit, Lake County, Florida, 5:19-CV-00561-JSM-PRL (10/2020) ***Plaintiff***
4. *Amy Hill v. Okmulgee County Criminal Justice Authority, et al.,* U. S. District Court of Oklahoma, Eastern District, 18-394-SPS (05/2020) ***Plaintiff***
5. *Joshua Reece vs.Shelby County, Kentucky D/B/A Shelby County Detention Center, et al.,* U. S. District Court, Eastern District of Kentucky, Frankfort Division, 3:16-CV-69-GFVT (03/2020) ***Defense***
6. *Euron Matthew v.Jake Debus, et al.,* U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-CV-06003 (02/2020) ***Plaintiff***
7. *Kevin Younger v. Jemiah L. Green,* U.S. District Court, District of Maryland, 24-C-17-0047S2 OC (01/2020) ***Plaintiff***
8. *Euron Matthew v.Jake Debus, et al.,* U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-CV-06003 (01/2020) ***Plaintiff***
9. *Kevin Younger v. Jemiah L. Green,* U.S. District Court, District of Maryland, 24-C-17-0047S2 OC (10/2019) ***Plaintiff***
10. *William Dillon, et al., v. Clackamas County and Craig Roberts,* U.S. District Court, District of Oregon, 3:14-cv-820-YY (07/2019) ***Plaintiff***
11. *Kevin Younger v. State of Maryland,* Circuit Court for Baltimore City, 24-C-17-0047S2 OC (06/2019) ***Plaintiff***
12. *Darcy Corbitt, Destiny Clark and John Doe v. Hal Taylor, Charles Ward, Deena Pregno and Jeanne Eastman,* U. S. District Court, Middle District of Alabama, Northern Division, 2:18-cv-00091-MHT-GMB (12/2018) ***Defense***
13. *Donald J. Hinson v. Sheriff Grady Judd; et al.,* U. S. District Court, Middle District of Florida, Tampa Division, 8:17-CV-02039-JDW-MAP (10/2018) ***Plaintiff***
14. *Solomon Cindea v. Matthew Abbott, et al.,* U. S. District Court, Northern District of Ohio, Eastern Division, 4:17-cv-02525 (09/2018) ***Plaintiff***
15. *Debra Hopkins v. Board of Wilson County, Kansas, Commissioners, et al.,* U.S. District Court, District of Kansas, 2:15-CV-2071-CM-GLR (08/2018) ***Defense***

16. *Michelle Kindoll, v. Southern Health Partners, et al.,* U. S. District Court, Eastern District of Kentucky, Northern Division at Covington, 2:17-CV-84-DLB-JGW (07/2018) ***Plaintiff***

17. *Rachel M. Hammers v. Douglas County, et. al,* U.S. District Court, District of Kansas, 2:15-CV-07994-CM-KGG (06/2018) ***Defense***

18. *Steven C. Smith v. Travis Turner, et al.,* U. S. District Court, Southern District of Alabama, 1:15-CV-371-CG-C (02/2018) ***Plaintiff***

19. *James Barnes v. Sheriff John T. Boyd, LaPorte County Sheriff's Department, LaPorte County et al.,* U. S. District Court, Northern District of Indiana, 3:16-CV-00190-RLM-MGG (01/2018) ***Defense***

20. *Robert Moore v. Mason County, Kentucky and Mason County, et al.,* U. S. District Court, Eastern District of Kentucky, 2:16-CV-00185-DLB-CJS ( 01/2018) ***Defense***

21. *Randy S. Hisey, for James Merchant v. Woodbury County; et al.,* U. S. District Court, Northern District of Iowa, Western Division, 7C16-CV-4111 (11/2017) ***Defense***

22. *Taylor Martin v. Miguel Huapilla, Dayton Gaston, Joseph Peaks and Michael Scott,* U. S. District Court, Middle District of Florida, 2:16-cv-537-FTM-99MRM (08/2017) ***Defense***

23. *Jose Luis Garza v. City of Donna, Texas,* U.S. District Court, Southern District of Texas, McAllen Division, 7:16-CV-00558 (05/2017) ***Plaintiff***

24. *Anthony Waller v. Bradley Lovinger,* U.S. District Court, District of Colorado, 14-CV-02109-WYD-NYW (05/2017) ***Plaintiff***

25. *Bradley Johansen v. Officer A.J. Cox and the City of Kent,* U.S. District Court, Western District of Washington at Seattle, 216-CV-004160 (01/2017) ***Defense***

26. *Rachel M. Hammers v. Douglas County, et. al,* U.S. District Court, District of Kansas, 2:15-CV-07994-CM-KGG (08/2016) ***Defense***

27. *Charles Axl Rose v. McCreary County, et al.,* U. S. District Court, Eastern District of Kentucky, 6:14-CV-00111-GFVT (03/2016) ***Defense***

28. *Timothy Redmond, et. al. v. Scott Crowther, et. al.,* U. S. District Court, District of Utah, 2:13-cv-00393DAK (7/2015) ***Defense***

29. *Jerome Odom v. Steve Whidden,* Twentieth Judicial Circuit, Florida, Civil Division, Number 2012-570-CA (7/2015) ***Defense***

30. *Christina Bobbin v. Corizon Health, Inc., f/k/a Prison Health Services, Inc., et. al., Mike Scott, et. al.,* U. S. District Court, Middle District of Florida, 2:14-cv-158-FtM-29DNF (07/2015) ***Defense***

31. *Shana Bennett v. Hinds County, Mississippi, and John and Jane Does 1-100*, U. S. District Court, Southern District of Mississippi, 3:14-CV-753-DNJ-FKB (02/2015) consolidated with *Damion Lewis and Derrick Lewis v. Hinds County, Mississippi, John and Jane Does 1-100*, U.S. District Court, Northern District of Mississippi, 3:14-cv-450-TSL-JM (02/2015) ***Plaintiff***

32. *Joseph Reilly v. Sheriff of Leon County, Florida,* U. S. District Court, Northern District of Florida, 4:14-

CV-00397-RH-CAS (01/2015) ***Defense***

33. *FK.S., K.K., H.M., T.K., J.H., S.B., S.C., T.S., C.K., D.R., L.A., and M.L., v. City of Puyallup, Police Chief Bryan Jeter, Lieutenant Edward Shannon,* U. S. District Court, Eastern District of Washington, 3:13CV-05926 (12/2014) ***Defense***

34. *Oral Jason Murphy v. Clark County Sheriff's Office, Paul Gaudette, Tammy Webster,* U. S. District Court, Eastern District of Missouri, 13-CV-1103 (11/2014) ***Plaintiff***

35. *Frank Hyman v. City of Philadelphia, Warden Clyde Gainey, Deputy Warden Gerald May, Lieutenant Demond Anderson, Corrections Officers Dwayne Corley and Ryan Hoover*, U. S. District Court, Eastern District of Pennsylvania, 10-499 (05/2014) ***Plaintiff***